HART SCHAFFNER & MARX AND SUBSIDIARIES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hart Schaffner & Marx & Subsidiaries v. Commissioner
Docket Nos. 16474-79, 16475-79, 16476-79.
United States Tax Court
T.C. Memo 1982-348; 1982 Tax Ct. Memo LEXIS 405; 44 T.C.M. (CCH) 184; T.C.M. (RIA) 82348; June 21, 1982. Edward C. Rustigan and Martin G. Rosenstein, for the petitioners. Seymour I. Sherman and Val J. Albright, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge:[2] In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Petitioner
Docket No.
Ended
Deficiency
Hart Schaffner & Marx
and Subsidiaries
16474-79
January 31, 1976
$1,801,635
Wallach's, Incorporated
16475-79
January 31, 1975
136,943
Jack Henry Clothing
Company
16476-79
January 31, 1975
5,344
Certain issues have been resolved by agreement of the parties. The only issue presented for decision is whether a transaction *407 between petitioners and PHS Finance Company constituted a sale or other disposition of certain intercompany inventory outside the Hart Schaffner & Marx group of related corporations. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Hart Schaffner & Marx (hereinafter HSM) was a New York corporation with its principal office in Chicago, Illinois, at the time it filed its petition herein. On October 15, 1976, HSM and 105 other corporations, consisting of subsidiaries of HSM, and subsidiaries of subsidiaries, filed their original consolidated corporate income tax return for the fiscal year ended January 31, 1976, with the District Director of Internal Revenue at Chicago, Illinois. On October 17, 1977, the same entities filed an amended consolidated return for that year. The business of HSM, since *408 its inception in 1887, has been the making and selling of apparel. Wallach's, Incorporated (hereinafter Wallachs) was a New York corporation with its principal office in Long Island City, New York, at the time it filed its petition herein. On April 15, 1975, it filed its corporate income tax for fiscal year ended January 31, 1975, with the Internal Revenue Service Center at Holtsville, New York. For the fiscal year ended January 31, 1976, it joined in the consolidated return and the amended consolidated return filed by HSM and various subsidiaries. At all times here pertinent, Wallachs has been a wholly owned subsidiary of HSM. Jack Henry Clothing Company (hereinafter Henry) was a Missouri corporation with its principal office in Kansas City, Missouri, at the time it filed its petition herein. On April 15, 1975, it filed its corporate income tax return for the fiscal year ended January 31, 1975, with the Internal Revenue Service Center at Kansas City, Missouri. For the fiscal year ended January 31, 1976, it joined in the consolidated return and the amended consolidated returns filed by HSM and various subsidiaries. At all times here pertinent, Henry was also a wholly owned *409 subsidiary of HSM. Prior to filing a consolidated Federal income tax return for the fiscal year ended January 31, 1976, HSM and its subsidiaries had filed separate returns. HSM and its manufacturing subsidiaries had filed their prior returns and maintained their books and records on the basis of a fiscal year ended November 30. Substantially all of HSM's retail subsidiaries (and their subsidiaries) at all times here pertinent maintained their books and records and filed their separate returns on the basis of a fiscal year ended January 31. HSM filed its last full year separate return for the fiscal year ended November 30, 1974. It subsequently changed its fiscal year to one ending January 31, filed a separate return for a short fiscal period December 1, 1974 to January 31, 1975, and then filed a consolidated return with its subsidiaries, including Wallachs and Henry, for the fiscal year ended January 31, 1976. HSM and certain of the corporations which joined in filing the consolidated return for fiscal year ended January 31, 1976, were at all times here pertinent manufacturers of men's clothing. The items manufactured consisted principally of men's suits, sports coats, *410 slacks, outercoats, rainwear and sportswear. Thirteen such manufacturing subsidiaries (hereinafter referred to as the "manufacturing subsidiaries") are: Hickey-Freeman Co., Inc. Thorngate, Ltd. M. Wile & Company Johnny Carson Apparel, Inc. Gleneagles, Inc. Hanover Slack's, Inc. Silver/Gulf Manufacturing Co. Anniston Sportswear Corp. Albert Given Manufacturing Co. Jaymar-Ruby, Inc. E-Town Sportswear Rector Sportswear Russellville Sportswear HSM also had a retail operating division known as the Patterson-Fletcher Division, as well as numerous retailing subsidiaries. On January 31, 1975, HSM and its retailing subsidiaries owned and operated in excess of 250 retail stores at which men's and women's apparel was sold. HSM and its manufacturing subsidiaries sell apparel manufactured by them to HSM's retailing subsidiaries and retailing division as well as to independent retailers. Field Enterprises, Inc. (hereinafter Field Enterprises) was a diversified company which engaged in many businesses including the publication of the Chicago Sun-Times and Chicago Daily News, the processing of paper, the publication and sale of encyclopedias and reference *411 books, and television broadcasting. Field Enterprises also had divisions or subsidiaries related to real estate, insurance and the direct sale of cosmetics, a venture which was later aborted. PHS Finance Company (hereinafter PHS) was an Illinois corporation which, since its inception on or about January 28, 1975, was a wholly owned subsidiary of Field Enterprises. The principal office and place of business of both PHS and Field Enterprises is Chicago, Illinois. Under date of January 31, 1975, HSM and PHS executed a document entitled "Inventory Sale Agreement" (hereinafter referred to as the Agreement). The Agreement contained the following pertinent provisions: 1. Sale of Intercompany Inventory
Section 1.1 Sellers hereby sell, transfer, assign and deliver to Buyer, and Buyer hereby purchases and acquires from Sellers, as of the close of business on the Sale Date, all the Intercompany Inventory then owned by Sellers. Section 1.2 The purchase price for the Intercompany Inventory shall be an amount equal to the dollar value of such Intercompany Inventory shown on Sellers' books and records as of the Sale Date, adjusted, as provided in Section 1.3B, by a physical *412 inventory to be taken by Sellers as of the close of business of each store of the Sellers on the Sale Date less a fee of $285,000, which fee includes interest as well as risk of obsolescence ("Purchase Price"). The Purchase Price plus the fee is hereinafter referred to as the "Exact Amount Due". Sellers warrant that Purchase Price will be not less than $20 million nor more than $30 million. Section 1.3 The Purchase Price shall be paid as follows: A. Simultaneously with the signing of this Agreement, Buyer shall pay $5,000,000 to HSM. Buyer shall at the same time execute and deliver to HSM a promissory note payable to the order of HSM in a principal amount equal to the maximum Purchase Price of $30,000,000 less $5,000,000. The promissory note for $25,000,000 shall be dated January 31, 1975 and shall be dated January 31, 1975 [sic] and shall be in the form of Exhibit III attached hereto. B. On or before March 15, 1975, Sellers shall furnish Buyer with a written statement of the Purchase Price and the Exact Amount Due, which will be determined by the aforesaid physical inventory as of the Sale Date. C. If the Purchase Price shown on said written statement is *413 less than Sellers' maximum thereof set forth above in Section 1.3A, a new promissory note payable to HSM shall immediately be executed by Buyer and delivered to HSM. The new promissory note shall be in all respects identical to Exhibit III, except that the principal amount thereof shall be decreased by an amount equal to such deficiency. Thereupon, the January 31, 1975 promissory note (Exhibit III) delivered at the signing of this Agreement will be marked "cancelled" and returned to Buyer by HSM. Section 1.4 The Settlement Schedule is shown on Exhibit IV attached hereto. [4] The term "settlement period" refers to the time periods specified in Column 1 of Exhibit IV. The term "settlement date" refers to the dates specified in Column 2 of Exhibit IV. On each settlement date, commencing with March 17, 1975, HSM shall remit to Buyer, by payment through the First National Bank of Chicago, an amount equal to the percentage specified in Column 3 of Exhibit IV of the Exact Amount Due. Each of said percentages represents Seller's forecasts of approximate sales of Intercompany Inventory (which shall be sold by Sellers as agents for the Buyer) during the settlement *414 period immediately preceding such settlement date. Section 1.5 By giving the other party at least 10 days written notice of its election, Buyer or HSM may, at any time between March 18, 1975 and September 14, 1975, require an adjustment to reconcile any difference between: (i) the dollar amount of the Intercompany *415 Inventory on hand (at values used in determining the Purchase Price), as verified by a physical inventory to be taken as of the last day of the settlement period in which such notice is given (the "reconciliation date"), and (ii) the dollar amount shown as Intercompany inventory (at values used in determining the Purchase Price) on the books of Buyer maintained in accordance with this agreement as of such reconciliation date (before taking into account any adjustment resulting from the taking of a physical inventory). For each reconciliation date, the amount determined under (i) is hereinafter called "Sellers' Balance", and the amount determined under (ii) is hereinafter called "Buyer's Balance". If Sellers' Balance is less than Buyer's Balance, HSM shall within 30 days pay to Buyer an amount equal to such difference, and if Sellers' Balance is greater than Buyer's Balance, Seller may prepare a supplemental Exhibit IV, pursuant to Section 1.6, reducing the next payment to Buyer by the amount of such difference. Section 1.6 At the time of any payment or credit called for by an adjustment made pursuant to Section 1.5, Sellers shall furnish to Buyer a supplemental *416 Exhibit IV setting forth Sellers' estimate of future sales of intercompany inventory. Each such supplemental Exhibit IV shall be substituted for the prior Exhibit IV (or the prior supplemental Exhibit IV furnished hereunder) as soon as Buyer shall agree to and acknowledge receipt thereof, evidenced by the signature on each page thereof of an authorized representative of Buyer. Thereafter, subsequent remittances shall be made on the basis of such supplemental Exhibit IV or until Buyer agrees to and acknowledges receipt of a new supplemental Exhibit IV. In the event that Buyer shall fail or refuse so to agree to or acknowledge receipt of any supplemental Exhibit IV so furnished by Sellers to Buyer, any payment theretofore made by HSM to Buyer by reason of adjustments made pursuant to Section 1.5 shall be applied as prepayments of remittances due to Buyer pursuant to Section 1.4 (Exhibit IV) on the next ensuing settlement dates. The installment payments due Buyer according to the Column 3 of Exhibit IV exceed payments due HSM under the promissory note (Exhibit III) by certain dollar amounts. If Exhibit IV is adjusted, or any payment, *417 or reduction in payment is made, as described in Section 1.5, then payments due under Exhibit III shall be correspondingly adjusted to conform to the schedule but in a manner so that the same dollar amount of the excess payments in the original Exhibit IV over the original Exhibit III will be maintained and paid to Buyer on each of the dates specified. In the event of default by HSM or any Seller, remaining amounts due to Buyer pursuant to Exhibit IV in excess of the amounts due to HSM pursuant to Exhibit III shall be paid by HSM to Buyer in full performance of all payments due Buyer, and Buyer's note shall then be deemed paid. Section 1.7 The parties hereto acknowledge that the Intercompany Inventory is sold to Buyer finally and irrevocably and that Sellers do not guarantee the saleability of such Intercompany Inventory. 2. Representations and Warranties of Sellers
HSM and each of the Retail Subsidiaries, jointly and severally, hereby represent and warrant unto Buyer as follows: A. Each of the Sellers is qualified under the laws of the state or states in which it operates retail stores to sell at retail in such state or states, apparel products *418 including the Intercompany Inventory, as principal or as agent. The execution and performance of this Agreement has been duly authorized by all necessary corporate action of Sellers. B. Sellers will, at the close of business on the Sale Date, hold title to the Intercompany Inventory, free and clear of any encumbrances, liens or any rights in or claim of any third parties, subject only to the rights of retail purchasers in any items of the Intercompany Inventory which Sellers shall have contracted to sell to retail purchasers in the normal course of Sellers' business. C. Sellers' written statement of the Exact Amount Due furnished pursuant to Section 1.3B will be true and correct and such amount will not be subject to any liens or claims of suppliers or creditors. D. The sale and assignment of the Intercompany Inventory to Buyer will vest in Buyer full and complete title to the Intercompany Inventory. E. Sellers have full power and authority to sell the Intercompany Inventory to Buyer as herein provided, and the Intercompany Inventory will be the property of the Buyer as the purchaser thereof. F. Sellers will fulfill all obligations on their part to the retail *419 customers under or in connection with the retail sale of Intercompany Inventory acquired by Buyer hereunder and will do nothing prior to such retail sale to impair Buyer's right to the Intercompany Inventory. G. HSM and each of the Retail Subsidiaries, jointly and severally, agree that until this Agreement is fully performed the corporate existence of Hart Schaffner & Marx and of each of the Retail Subsidiaries will be maintained, that the business of each of them will be carried on and conducted substantially as such businesses are now being carried on and conducted, that none of them will become insolvent or be unable to pay its debts as they mature or make a general assignment for the benefit of its creditors, be adjudicated bankrupt or file a petition in bankruptcy or for reorganization. 3. Appointment of Sellers as Buyer's Agent
Buyer hereby appoints Sellers as its agents, effective at the opening of Sellers' respective stores for business February 1, 1975, for the sole purpose of selling the Intercompany Inventory in each of such stores at retail to the ultimate consumer. Unless and until otherwise notified in writing by Buyer of the revocation thereof, Sellers are *420 hereby authorized and empowered, and Sellers hereby agree, at Sellers' own cost and expense, as Buyer's agents, to: A. Identify by appropriate labels each item of Intercompany Inventory sold to Buyer as property of Buyer. B. Use their best efforts to sell the Intercompany Inventory at its full retail price. C. Hold for Buyer all Intercompany Inventory that may be returned or rejected by, or repossessed from, Sellers' customers, and forthwith as Buyer's agents resell said former Intercompany Inventory for Buyer at the best price obtainable for the rejected or repossessed merchandise. D. Allow, or cause to be allowed, such rebates or adjustments on the Intercompany Inventory, whether or not accompanied by the return, rejection or repossession of any or all of the Intercompany Inventory, as Sellers or Buyer may determine to be right and proper and consistent with the business policy of Sellers, or in order to facilitate maximum saleability of the Intercompany Inventory. E. Maintain complete and accurate perpetual inventory records to enable Buyer to determine the status of its inventory. A statement of inventory not sold will be available to Buyer on a quarterly basis. *421 The records will be available at any time during normal business hours for Buyer's inspection and audit. F. Prepare and deliver to Buyer, at the time of each settlement, written reports, certified by an officer, setting forth such information as Buyer may reasonably request with respect to the Intercompany Inventory and the sale thereof, all reports being as of the end of the period to which the settlement relates. G. Maintain insurance against fire, theft, pilferage, liability of all kinds, loss or other destruction of the Intercompany Inventory in amounts and companies satisfactory to Buyer, in Buyer's favor and, when requested by Buyer to supply appropriate certificates of insurance. Unless otherwise specified by Buyer, the amount of coverage in respect of physical loss shall never be less than the unpaid portion of the Exact Amount Due. H.Furnish such information and reports as Buyer may from time to time reasonably request relating to the Intercompany Inventory, including, without limitation, copies of audits and other statistical data obtained or prepared by Sellers setting forth the sale of the Intercompany Inventory and any physical verification thereof. 4. *422 Unsold Intercompany Inventory
Section 4.1 Buyer shall have the right to terminate Sellers' agency for the resale of the Intercompany Inventory under this Agreement at any time. In the event of such agency termination, Buyer shall have the right, after 10 days' notice of its intention to terminate the agency, to remove all unsold Intercompany Inventory from Sellers' stores. Section 4.2 Buyer shall have the option to sell any unsold Intercompany Inventory not sold at retail by September 15, 1975 to a factor or any other purchaser, after 10 days' notice to Sellers of Buyer's intention to make such a sale.
Section 4.3 The amount of the Intercompany Inventory removed by Buyer pursuant to Section 4.1 or Section 4.2 shall reduce the amount owing by Sellers to Buyer in an amount equal to the value at which such goods were carried on Sellers' books in determining the Purchase Price. Section 4.4 The options in Sections 4.1 and 4.2 may be exercised by Buyer by giving written notice thereof to HSM, which shall be the agent for Sellers for this purpose, by registered mail at the following address: Hart Schaffner & Marx, 36 South Franklin Street, Chicago, *423 Illinois 60606, Attention: Treasurer. 5. Rights and Remedies of Buyer
Section 5.1HSM and each of the Retail Subsidiaries, jointly and severally, agree to protect, defend and hold Buyer harmless against all liabilities, claims and obligations, including all costs and expenses with respect to such liabilities, claims and obligations, resulting from failure to comply with the provisions of the Bulk Sales Act of any state arising out of the sale of the Intercompany Inventory; any acts or omissions of Sellers relating to the sale of such Intercompany Inventory; any defalcation or misappropriation by Sellers' employees in the handling and sale of the Intercompany Inventory or the proceeds thereof; any acts of any employee of Sellers which shall result in a claim against Buyer; any state or local personal property taxes, assessed against the Intercompany Inventory while in possession of Sellers as agents for Buyer; and any other state or local sales, income, franchise, excise or other taxes, license fees or other expenses or charges arising out or assessed in respect of the Intercompany Inventory, the sale thereof by Sellers, the purchase and ownership thereof by Buyer and *424 the conduct of Sellers' business as agents for Buyer. 6. Miscellaneous
Section 6.1 It is expressly agreed and understood that the Intercompany Inventory sold to Buyer hereunder shall not include any goods sold by the Manufacturing Group to the Sellers subsequent to the sale date. Sellers agree that their records will clearly identify and distinguish the Intercompany Inventory sold to Buyer hereunder from all other inventory. Section 6.3 This Agreement shall be governed in all respects by the local laws of the State of Illinois applicable to contracts made and to be performed entirely within such state. This Agreement went through at least 16 separate drafts with earlier drafts referring to Field Enterprises as the "Buyer". Alexander Hehmeyer, [5] executive vice president and general counsel of Field Enterprises from October 1, 1967 until December 31, 1974 and counsel to the law firm of Isham, Lincoln and Beale since January 1, 1975, was the principal negotiator on behalf of PHS and John R. Meinert, executive vice president and board director of HSM, was the principal negotiator on behalf of HSM. Charles L. Stewart, general counsel for HSM and member of the law *425 firm of Mayer, Brown and Platt and its predecessors prior to joining HSM in 1971, acted as the principal draftsman of the Agreement.
PHS paid HSM $5 million upon execution of the Agreement and executed a document in the amount of $25 million entitled "Promissory Note". The records of HSM and PHS reflect that on January 31, 1975, HSM and PHS exchanged executed copies of the HSM-PHS Agreement and that PHS provided HSM with the executed copy of the document entitled "Promissory Note", an unexecuted copy of which was also attached to the Agreement as Exhibit III. The Promissory Note provided that: FOR VALUE RECEIVED, PHS FINANCE CORPORATION * * * ("Maker"), hereby promises to pay to HART SCHAFFNER & MARX * * * ("Payee"), the principal amount of $25,000,000, without interest, in accordance with the following schedule of percentage payments of such principal amount: Percentage
On or Before
During the Period
Cumulative
March 17, 1975
25%
25%
April 15, 1975
20%
45%
May 15, 1975
15%
60%
June 16, 1975
10%
70%
July 15, 1975
10%
80%
August 15, 1975
10%
90%
September 15, 1975
10%
100%
*426 The Promissory Note further provided that: This Note is issued pursuant to, and subject to the provisions of, the Inventory Sale Agreement dated January 31, 1975 between the Marker, Payee and certain other parties, and this Note is subject to payment, in whole or in part, as specified in such Agreement including the provisions thereof with respect to revision of the payment dates or amounts. No recourse shall be had for the payment of principal of, or any interest on this Note, or for any claim based thereon, against any employee, officer, director or stockholder, as such, of the Maker. This Note shall be payable only to the above name Payee and shall not be assignable or negotiable without the prior written consent of Maker. The "intercompany inventory" consisted of men's apparel which had been manufactured by HSM and its manufacturing subsidiaries. Such merchandise had been purchased by the retailing subsidiaries and division and was owned by the retailing subsidiaries and division at the close of business on January 31, 1975. The actual book value of the intercompany inventory was unknown at the time the Agreement was signed, HSM warranting only that the "Purchase Price" *427 as so determined would be between $20 million and $30 million. See Section 1.2 of the Agreement, supra. Despite a reference in the Agreement to "all" intercompany inventory, that part of the intercompany inventory made up of "Great Western" goods, an insignificant part of the intercompany inventory which contained no intercompany profit, was excluded. See also footnote 9, infra.
PHS was formed, in part, to avoid subjecting Field Enterprises to lawsuits (including libel suits against its newspaper division) in states in which Field Enterprises did not at that time do business and in which intercompany inventory was located and would be sold.PHS did not obtain any certificate of authority to do business as a foreign corporation in the various states. [6]Its total capital consisted of $50,000 represented by $10,000 of paid-in-capital (1,000 shares at $10 par value) and $40,000 of paid-in-surplus. Shortly after its organization, PHS borrowed $5,750,000 on January 31, 1975, from the First National Bank of Chicago executing a promissory note therefor. The note contained no limitations as to assignability or negotiability. This First National Bank loan to PHS was fully guaranteed *428 by Field Enterprises, a corporation with a net worth over $100 million, because PHS did not have any credit standing. [7]
HSM issued a bulletin, dated January 24, 1975, to store presidents and controllers requesting that each store "prepare and telegram" no later than January 29, 1975, an estimate of the intercompany inventory expected to be on hand on January 31, 1975. Such information was needed by HSM because, under the terms of the Agreement with PHS, the closing was going to take place based upon an estimated amount and HSM wanted to be certain that it had the best estimate available right up to the date of the Agreement. *429 The retailing subsidiaries and division responded to this bulletin by telegram, mailagram or telephone. On February 7, 1975, HSM issued a special bulletin, Bulletin No. 1603, to all store presidents and controllers. This special bulletin had the following three prime purposes: (1) To request each of the retail stores to report the exact amount of intercompany inventory on hand and in their possession at January 31, 1975; (2) to instruct the stores on how to identify and mark each piece of intercompany inventory; and (3) to instruct the stores on how to record for accounting purposes the transaction with PHS. [8] In contrast to the bulletin dated January 24, 1975, Bulletin No. 1603 requested actual values rather than estimates. Such information was needed because under the Agreement with PHS, HSM was to furnish to PHS on or before March 15, 1975, a statement of the purchase price and Exact Amount Due under the Agreement. Accordingly, the exact amount of intercompany inventory actual values was needed, not mere estimates. [9]
*430 The following summary of intercompany inventory on hand at the close of business on January 31, 1975, was annexed to a letter dated March 13, 1975, to PHS from John Meinert: Retail
Net Cost
Inventory
Inventory
at 1/31/75
at 1/31/75
VENDOR
CLOTHING
Hart Schaffner & Marx
$33,222,394
$16,619,305
Hickey Freeman Co., Inc.
8,733,235
4,376,840
M. Wile Company, Inc.
7,934,342
3,972,084
Johnny Carson Apparel, Inc.
3,198,048
1,601,958
Gleneagles, Inc.
1,802,861
902,453
Jaymar-Ruby, Inc.
2,709,263
1,351,570
Austin Reed of Regent Street
2,903,446
1,450,551
Total
$60,503,589
$30,274,761
SPORTSWEAR
Jaymar-Ruby, Inc.
$ 268,225
$ 131,171
California Sportwear Company
90,374
44,096
Austin Reed of Regent Street
Gleneagles/Great Western
220,877
108,658
Total
$ 579,476
$ 283,925
Total
$61,083,065
$30,558,686
Less: Cash Discount Reserve
$ 262,569
Adjustment of above values
$ 11,117
TOTAL INTER-COMPANY INVENTORY
$30,285,000
The letter from Mr. Meinert provided that: This statement furnishes you with the following information in accordance with our January 31, 1975 Agreement: "Purchase Price" (maximum)
$30,000,000
Fee specified in Agreement
285,000
"Exact Amount Due" Buyer
$30,285,000
*431 We are enclosing a complete set of the computations of the Intercompany Inventory at all the stores. On the recap sheet, an adjustment of $11,117 is shown which reduces the total to the $30,285,000 Intercompany Inventory on hand as of the close of business on January 31, 1975. This dollar value of $30,285,000 less a fee of $285,000 is $30,000,000 which is "the maximum Purchase Price of $30,000,000" set forth in our Agreement. Pursuant to Bulletin No. 1603 and in effectuating Section 6.1 and Section 3.A of the Agreement, each piece of inventory was identified and segregated from other inventory in the retail stores by marking the price tickets of all merchandise received after January 31, 1975, with an "X" or with some other symbol. PHS had insisted, and Mr. Hehmeyer had particularly insisted, that a provision as to merchandise identification be included in the Agreement. Mr. Stauffacher insisted that there be an inspection of the merchandise to make sure that the provisions as to identification and segregation were being adhered to and assigned Mr. Pilch and John Stolle, a new executive vice president of Field Enterprises, to do an on-site inspection. Accordingly, Mr. Pilch *432 and Mr. Stolle visited the flagship Baskin Clothing Store in Chicago and observed the inventory marking and identification. Baskin's inventory represented approximately $3 million, which represented about 10 percent of the total "Intercompany Inventory". In recording the transaction effectuated under the Agreement and in accordance with Bulletin No. 1603, each retailing subsidiary made an entry to decrease their inventory accounts and increase accounts receivable by the amount of inventory determined to be on hand on January 31, 1975. An entry was also made to record each retail store's proportionate share of the $285,000 loss in that the total inventory had a book value of $30,285,000 and the amount due was $30 million. In order to make the accounting procedures simple and comparable with records in prior periods, the retail stores were instructed to record all sales to the consumer, whether sales of the "marked" or the "unmarked" inventory, in the same manner. Since this resulted in a decrease in the inventory accounts and therefore a double deduction for the "unmarked" inventory sold to the consumer (and correspondingly another increase in accounts receivable), the retail *433 stores were instructed to make an entry each month by increasing the inventory accounts and decreasing the accounts receivable. The amount of this last entry was in the same ratio as the estimated sale rate contained in the Agreement. The transaction with PHS was not recorded as an outright sale on the books of the retail subsidiaries because it had always been the practice of HSM and its auditing firm that a sale of assets not in a normal course of business is not to be reflected as sales revenue. [10]
The balance sheet of PHS as of the close of business on January 31, 1975, reflects the following: ASSETS
CASH
$ 800,000.00
INVENTORY
30,285,000.00
$31,085,000.00
LIABILITIES
NOTE PAYABLE TO BANK
$ 5,750,000.00
NONINTEREST - BEARING NOTE PAYABLE TO
HART SCHAFFNER & MARX
25,000,000.00
Total Liabilities
$30,750,000.00
DEFERRED FEE INCOME
285,000.00
CAPITAL STOCK AND SURPLUS: Capital stock, $10 par value; 1,000 shares authorized and outstanding
$10,000.00
Paid-in surplus
40,000.00
50,000.00
$31,085,000.00
*434 The monthly balance sheets of PHS continued through August to show as "Inventory" the amount of $30,285,000 less the exact dollar amount of payments due from HSM pursuant to the repayment schedule provided under the Agreement.[11] The last monthly balance sheet of PHS showing "Inventory" was the balance sheet dated August 31, 1975, and it showed "Inventory" in the amount of $3,028,500. The balance sheet for September 30, 1975, reflects the following: ASSETS
CASH
$ 57,266.75
COMMERCIAL PAPER
100,000.00
ACCRUED INTEREST RECEIVABLE
236.09
PREPAID EXPENSES
595.40
$158,098.24
LIABILITIES
ACCRUED INCOME TAXES PAYABLE -
State
$ 4,000.00
Federal
50,000.00
Total liabilities
$ 54,000.00
CAPITAL STOCK AND SURPLUS: Capital stock, $10 par value;
1,000 shares authorized and outstanding
$10,000.00
Paid-in surplus
40,000.00
Earned surplus
54,098.24
104,098.24
$158,098.24
*435 On January 31, 1976, HSM and its retail subsidiaries still had located in stores owned or leased, and operated by them, a part of the Intercompany Inventory in the amount (as valued per the books and records of the respective entities) of $4,288,366 which had not been sold to retail consumers.HSM did not exercise its right, under the Agreement, to call for an adjustment to reduce its remittances of sales proceeds to PHS and, accordingly, the financial statements of PHS reflect amounts paid by HSM to PHS according to the repayment schedule under the Agreement. According to Mr. Hehmeyer, meticulous financial statements were maintained consistently reflecting the transaction as a purchase. An internal memorandum from Field Enterprises' treasurer's office, prepared by Mr. Pilch or under his supervision, reflects the following schedule of transactions from March 17, 1975 to September 15, 1975: [12]
*436 PHS
Transaction Dates
April 15
May 15
June 16
$6,057,000.00 $4,542,750.00 $3,028,500.00 (5,000,000.00)
(3,750,000.00)
(2,500,000.00)
$1,057,000.00 $ 792,750.00 $ 528,500.00 (1,150,000.00)
(862,500.00)
(575,000.00)
(33,002.60)
(25,036.46)
(19,422.22)
$ (126,002.60)
$ (94,786.46)
$ (65,922.22)
615,468.75 489,466.15 394,679.69 $ 489,466.15 $ 394,679.69 $ 328,757.47 $ 128,250.00 $ 171,000.00 $ 199,500.00 (101,283.85)
(126,320.31)
(145,742.53)
$ 26,966.15 $ 44,679.69 $ 53,757.47 50,000.00 50,000.00 50,000.00 412,500.00 300,000.00 225,000.00 $ 489,466.15 $ 394,679.69 $ 328,757.47 Transaction Dates
July 15
August 15
September 15
$3,028,500.00 $3,028,500.00 $3,028,500.00 (2,500,000.00)
(2,500,000.00)
(2,500,000.00)
$ 528,500.00 $ 528,500.00 $ 528,500.00 (575,000.00)
(575,000.00)
(575,000.00)
(13,201.04)
(9,407.64)
(4,703.82)
$ (59,701.04)
$ (55,907.64)
$ (51,203.82)
328,757.47 269,056.43 213,148.79 $ 269,056.43 $ 213,148.79 $ 161,944.97 $ 228,000.00 $ 256,500.00 $ 285,000.00 (158,943.57)
(168,351.21)
(173,055.03)
$ 69,056.43 $ 88,148.79 $ 111,944.97 50,000.00 50,000.00 50,000.00 150,000.00 75,000.00 $ 269,056.43 $ 213,148.79 $ 161,944.97 *437 At no time here pertinent did PHS own, lease or operate any retail clothing stores, or have in its employ persons whose duties included the sale of clothing at retail. [13] On January 31, 1975, and at all times pertinent thereafter (except as and when, and to the extent sold to retail customers) the inventory was and remained in the actual possession of the retailing subsidiaries or retailing division and was either then located in or in transit to various retail stores owned or leased, and operated by the retailing subsidiaries or division throughout the United States. No part of the inventory was moved, transferred or relocated as a result of the Agreement. As of January 31, 1976, sales at retail of the "Intercompany Inventory" by HSM and its retailing subsidiaries were already in the amount of $56,529,380 with, as stated above, "Inventory" with a value of $4,288,366 still unsold to consumers. No part of the excess of the amount realized on the *438 sale of the intercompany inventory at retail over the "Exact Amount Due" as defined in the Agreement was paid to PHS. Mr. Hehmeyer, as executive vice president and general counsel of Field Enterprises and principal negotiator of the Agreement on behalf of PHS, believed that pursuant to the Agreement PHS was liable to pay HSM $30 million, the amount referred to as the purchase price, even if the proceeds from the sale at retail of the intercompany inventory to consumers was less than that amount. Mr. Hehmeyer, as well as others in the management of Field Enterprises, also believed that as a result of entering into the Agreement, PHS owned the inventory. Mr. Meinert, as executive vice president of HSM and principal negotiator on behalf of HSM, believed that if the sale proceeds from the sale at retail of the intercompany inventory to consumers were less than the $30 million amount, e.g., if the sale proceeds were $25 million, PHS, under the Agreement, would still be obligated to pay HSM the entire $30 million and PHS would be entitled to receive only the sale proceeds, e.g., $25 million. Mr. Stewart, as vice president and general counsel of HSM and principal draftsman of the *439 Agreement, believed that the obligation of HSM under the Agreement was to pay the proceeds from the sale at retail of the intercompany inventory to consumers and the obligation was not to pay a specific stated sum. In addition, interoffice memoranda to and from Mr. Stewart, prepared prior to the final remittance due under the Agreement, expressed a decision by HSM not to call for an adjustment in the payments to PHS although sales at retail to consumers were not as brisk as anticipated because such an adjustment, according to the memoranda, would possibly cause PHS to revoke the agency of the retailing subsidiaries and division and remove remaining inventory, a right which Mr. Stewart and others in the management of HSM believed PHS possessed pursuant to the Agreement. [14] Mr. Stewart, Mr. Meinert and Jerome Dorf, vicepresident and controller of HSM, believed that PHS would be able under the Agreement to remove the most valuable intercompany inventory remaining ("the cream of the crop, the best of the inventory still there") and sell it elsewhere, and therefore HSM avoided any action which would provoke such an undertaking on the part of PHS. *440 Under a "Bank Credit Agreement", dated September 30, 1974, HSM arranged to borrow $35 million from 16 "Banks". Section 4 of the "Bank Credit Agreement" provides that a default has occurred if, inter alia, there has been a breach by HSM of any of the provisions of Section 3.2 of such agreement. Section 3.2 provides that, except with the consent in writing of "Banks" holding 67 percent of the loans or committments thereunder, HSM will not, nor will it permit any restricted subsidiary (as defined in Section 1.8 of the agreement) to, inter alia, (a) create, incur or suffer to exist, directly or indirectly, any indebtedness for borrowed money except unsecured borrowing by HSM under lines of credit, provided that HSM shall be free from such borrowing for a period of at least 45 consecutive days within each proceeding 2-year period (as well as other exceptions not pertinent here) or (b) create, incur or suffer to exist any pledge, mortgage, assignment or other encumbrance of or upon any of its assets or property (with exceptions again not pertinent here).
Under a "Loan Agreement", dated May 31, 1963, HSM arranged to borrow $12 million from The Equitable Life Assurance Society of the *441 United States. Under Section 11 of the "Loan Agreement", entitled "Remedies", Subsection 11.1 defines "Events of Default" as including, inter alia, a default in the performance or observation of any covenant, agreement or condition contained in Section 9.4 to 9.14 of such agreement. Section 9.5 of the "Loan Agreement", similar to Section 3.2 of the "Bank Loan Agreement", provides that HSM will not, and will not permit any subsidiary (as defined in Section 10.6 of the agreement) to, create, assume or suffer to exist, or in any manner become or be liable in respect of, any indebtedness, whether current or funded, except unsecured Current Liabilities (as defined in Section 10.15 of the agreement) for money borrowed by HSM provided that HSM shall be free from such Current Liabilities for a period of at least 45 consecutive days within each proceeding 2-year period (as well as other exceptions not pertinent here). Section 9.8 provides that HSM will not, and will not permit any subsidiary to, create, assume or incur, or suffer to be created, assumed or incurred or to exist, any mortgage, lien, pledge, charge or other encumbrance of any kind upon any property of any character of HSM or *442 any subsidiary (with exceptions again not pertinent here). Certain other provisions in this agreement were amended by a "First Supplemental Agreement", dated August 3, 1964, a "Second Supplemental Agreement", dated November 16, 1966, a "Third Supplemental Agreement", dated September 1, 1967 and a "Fourth Supplemental Agreement, dated May 8, 1969. Thus, both the "Bank Credit Agreement" and the "Loan Agreement" required that in each 2-year period, HSM be free of unsecured short-term indebtedness under lines of credit, with certain exceptions, for a consecutive period of 45 days. This requirement was satisfied by HSM during January and February of 1974. Mr. Meinert was aware of the default provisions in both the "Bank Credit Agreement" and the "Loan Agreement" and believed a default would cause disastrous financial results for HSM. Pursuant to Section 3.1(e)(1)(i) of the "Bank Credit Agreement", HSM was required to furnish to each of the 16 "Banks" a written statement by independent certified public accountants, within 120 days after the close of each fiscal year, to the effect that they obtained no knowledge of any default by HSM. A similar requirement, that is to furnish *443 The Equitable Life Assurance Society of the United States with such a statement, was provided for in Section 6B(2) of the "Loan Agreement". In a statement dated January 14, 1976, Price Waterhouse & Co. advised HSM that they, after examination of HSM financial records for fiscal year ended November 30, 1975, obtained no knowledge of any default by HSM in the performance of any of the applicable provisions of Sections 3 and 4 of the "Bank Credit Agreement" and a copy of this statement was sent to each of the 16 banks. Similarly, in a statement also dated January 14, 1976, Price Waterhouse & Co. advised HSM that they, after examination of the financial records of HSM for fiscal year ended November 30, 1976, obtained no knowledge of default by HSM in the performance of any of the covenants of Section 7.1, Section 9.2A or Sections 9.4-9.14 inclusive, of the "Loan Agreement", as amended, and a copy of this statement was sent to The Equitable Life Assurance Society of the United States. In order to avoid the possibility of default under either of the loan agreements HSM's practice was to try to satisfy the "short term debt free" 45-day period each year. [15] In addition, Standard & Poors *444 and Moody's look favorably upon HSM eliminating short term debt every year which accordingly affects bond ratings and interest costs. HSM found it easiest to eliminate short term debt during the months of January and February due to the increased cash flow, related to Christmas inventories, in those two months. HSM found it difficult to eliminate unsecured borrowing for 45 days in January and February of 1975. With respect to the 4-year period running from the fiscal year ended January 31, 1973 through January 31, 1976, inventories of HSM and its subsidiaries had "peaked", according to Mr. Meinert, just prior to January 3 - February of 1975. [16] In June 1974, employees of HSM went on strike in connection with a dispute concerning an industry wide contract with Amalgamated Clothing Workers Union. [17] Short term borrowing of HSM reached peaks of $2,500,000 during the fiscal year ended January 31, 1973, $19,100,000 during the fiscal year ended January 31, 1974, and *445 $29,857,143 during the fiscal year ended January 31, 1975, although as of December 31, 1974, such borrowings were in the amount of $8 million and as of January 31, 1975, they were $0. During 1973-1975 the prime rate charged by banks ranged from a low of 6 percent to a high of 12 percent and on January 31, 1975, the prime rate was 9-1/2 to 9-3/4 percent, such fluctuation in the prime affecting interest costs of HSM. As reflected in the books and records of HSM and its subsidiaries, the interest costs of HSM and its subsidiaries were $5,133,000 for fiscal year ended January 31, 1974, $7,479,000 for fiscal year ended January 31, 1975, and $5,893,000 for fiscal year ended January 31, 1976. *446 Sales and earnings of HSM and its subsidiaries, as reflected on the books of HSM and its subsidiaries, for the four fiscal periods ended January 31, 1973 through January 31, 1976 were as follows: 1/31/73
1/31/74
1/31/75
1/31/76
Sales
$429,070,000
$477,081,000
$493,573,000
$492,883,000
Earnings
14,732,000
16,045,000
10,301,000
9,807,000
As reflected in the minutes dated January 15, 1975, HSM reduced its quarterly dividend rate from $ .22 to $ .15 and thereby reduced the total dividend payment by $614,000 in the first quarter of 1975 and by $2,422,000 for the year ended January 31, 1976.This represented the first dividend cut in 25 years and, according to management of HSM, was necessitated by the recession "which was the worst one for our industry and the company since the Great Depression". In another step to improve the financial condition of HSM, management introduced a program of stringent economies whereby expenses, hiring, capital expenditures and repairs were cut back. [18] In a step specifically designed, according to Mr. Meinert, to meet the debt free 45-day dictate, management induced major fabric suppliers of HSM to accept payment *447 in February 1975, on invoices, some of which were due as early as December 1974. [19] On January 31, 1975, subsidiaries of HSM sold to First National Bank of Chicago accounts receivable and thereby raised approximately $2 million in cash, another step, according to Mr. Meinert, to improve the cash position of HSM and its subsidiaries and meet the debt free 45 day dictate. [20]
*448 During 1974, HSM and its subsidiaries opened 11 retail stores [21] and closed 4 other stores. [22] During 1974, HSM and its subsidiaries also sold 22 stores [23] thereby raising over $5 million in cash. Nineteen of such 22 sales were made pursuant to a consent decree entered in antitrust proceedings involving HSM.
*449 According to Mr. Meinert, with the benefit of the foregoing financial measures, HSM was able to remain free of short term debt for a period of 45 consecutive days during 1975. On January 31, 1974, Leopold, Price and Rollee, Inc. and Hastings Clothing Company, two retailing subsidiaries of HSM, entered into agreements for the sale to the First National Bank of Chicago of accounts receivable. Similar to the Agreement between HSM and PHS, such agreements provided, inter alia, that the seller of the accounts receivable would act as agents of the buyer for purposes of collecting the amounts and, in its capacity as buyer's agent, seller would remit to buyer a certain percentage of the amount from collections due to buyer under the agreements. Similar agreements, already referred to above, were entered into on January 31, 1975, between Klopfenstein's, Inc., Capper & Capper, Ltd., and Samuel Rosenblatt Co., three retailing subsidiaries of HSM, and First National Bank of Chicago. It was not unusual for HSM or its subsidiaries to sell accounts receivable. No filings with any state or local government were made at any time here pertinent by HSM, any of its subsidiaries, or PHS in support *450 of the transaction with respect to the provisions of the Bulk Sales laws of any state. Prior to January 31, 1975, HSM or its subsidiaries had consistently obtained favorable rulings from the Internal Revenue Service with respect to the sale of accounts receivable in which the seller of the accounts receivable would act as a collecting agent for the buyer and where the buyer had full recourse. Accordingly, Mr. Meinert relied upon his experience with accounts receivable in negotiating the Agreement and believed that by providing in the Agreement that the transaction was without recourse, the transaction would be assured of sale treatment for tax purposes since favorable rulings were received for transactions in which the buyer had full recourse. [24] On December 13, 1974, HSM applied to the Internal Revenue Service for a ruling on the transaction governed by the Agreement. After some delay and instances in which representatives of HSM believed and perceived that a favorable ruling would be forthcoming, it appeared that the ruling would not be favorable and the request was withdrawn on October 19, 1976. *451 OPINION Hart Schaffner & Marx, a New York corporation, has been in the business of selling and manufacturing suits since its inception in 1887. HSM and some of its subsidiaries were manufacturers of men's clothing during the years in issue. The items manufactured consisted principally of suits, sports coats, slacks, outercoats, rainwear and sportswear. HSM also had a retail operating division, known as the Patterson-Fletcher Division, as well as numerous retailing subsidiaries. On January 31, 1975, HSM and its retailing subsidiaries owned and operated in excess of 250 stores at which men's and women's apparel was sold. HSM and its manufacturing subsidiaries sell apparel manufactured by them to HSM's retailing subsidiaries and retailing division as well as to independent retailers. On October 15, 1976, HSM and 105 other corporations, consisting of subsidiaries of HSM and subsidiaries of subsidiaries, filed their original consolidated corporate income tax return for the fiscal year ended January 31, 1976, and on October 17, 1977, the same entities filed an amended consolidated return for that year. Prior to filing a consolidated return, HSM and its subsidiaries had filed *452 separate returns. HSM and its manufacturing subsidiaries had filed their prior returns and maintained their books and records on the basis of a fiscal year ended November 30. Substantially all of HSM's retail subsidiaries (and their subsidiaries) maintained their books and records and filed their separate returns on the basis of a fiscal year ended January 31. HSM filed its last full year separate return for the fiscal year ended November 30, 1974. It subsequently changed its fiscal year to one ending January 31, filed a separate return for a short fiscal period December 1, 1974 to January 31, 1975, and then filed the consolidated return for fiscal year ended January 31, 1976, with its subsidiaries, including Wallach's and Henry. PHS was an Illinois corporation which, since its inception on or about January 28, 1975, was a wholly owned subsidiary of Field Enterprises. Field Enterprises was a diversified company which engaged in many businesses including the publication of the Chicago Sun-Times and Chicago Daily News, the processing of paper, the publication and sale of encyclopedias and reference books, and television broadcasting. Field Enterprises also had divisions or *453 subsidiaries related to real estate, insurance and the direct sale of cosmetics, a venture which was later aborted.
Under date of January 31, 1975, HSM and PHS executed a document entitled "Inventory Sale Agreement".Petitioners contend that the transaction entered into between HSM and PHS pursuant to this Agreement constitutes a sale of certain "intercompany inventory" to PHS, a corporation outside the HSM group of related corporations. They argue that the transaction, in its most simplistic terms, consists of a sale by HSM to PHS of intercompany inventory manufactured by HSM (and certain subsidiaries of HSM) and then an agency relationship between PHS and HSM (and certain retailing subsidiaries and retailing division of HSM) whereby HSM, as agent for PHS, sells inventory at retail to consumers. To the contrary, respondent contends that the transaction between HSM and PHS was in substance and effect a loan or financing transaction secured by the intercompany inventory and was not a sale. Thus, respondent argues that, pursuant to section 1.1502-18(b), Income Tax Regs., the intercompany profit inhering in such inventory must be included in the consolidated return filed by the HSM *454 group of corporations for fiscal year ended January 31, 1976. [25]
It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). Semantic technicalities, labels and ingeniously drafted formal written documents do not necessarily control the tax consequences of a transaction. Commissioner v. P.G. Lake Co.,356 U.S. 260, 266-267 (1958); Helvering v. Clifford,309 U.S. 331, 334 (1940); Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939); Union Planters National Bank of Memphis v. United States,426 F.2d 115, 118 (6th Cir. 1970), *455 cert denied 400 U.S. 827 (1970); Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Our concern is with the objective economic realities of a transaction rather than the constructed form employed by the parties. Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978); Kansas City Southern Railway v. Commissioner,76 T.C. 1067, 1093-1094 (1981). As the Supreme Court stated in Frank Lyon Co. v. United States,supra at 573: The Court has never regarded "the simple expedient of drawing up papers," Commissioner of Internal Revenue v. Tower,327 U.S. 280, 291, 66 S.Ct. 532, 538, 90 L.Ed. 670 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S., at 255, 60 S.Ct., at 210. See also Commissioner of Internal Revenue v. P.G. Lake, Inc.,356 U.S. 260, 266-267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *456 Commissioner of Internal Revenue v. Court Holding Co.,324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner of Internal Revenue v. Duberstein,363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). In determining whether the transaction between HSM and PHS, effectuated pursuant to the document entitled "Inventory Sale Agreement", constitutes a "sale" for tax purposes, the Code and regulations provide little guidance. In Commissioner v. Brown,380 U.S. 563, 570-571 (1965), the Supreme Court said that a sale is "a common event in the nontax world" and its "common and ordinary meaning" should be given persuasive effect for tax purposes. See Grodt and McKay Realty, Inc. v. Commissioner,supra at 1237. Our understanding of Commissioner v. Brown,supra, as we have expressed in Kraut v. Commissioner,62 T.C. 420 at 428 (1974), is that: Inherent in the Court's understanding of a sale is the notion of movement through exchange, the idea that, at the conclusion of the sale, the *457 buyer possess that which was the object of the sale. * * * Recently, in Grodt & McKay Realty, Inc. v. Commissioner,supra, we focused on whether the purported purchaser had acquired the benefits and burdens of ownership [26] in determining whether a sale had occurred, and we listed the following factors considered by the courts in making such a determination: (1) Whether legal title passes ( Commissioner v. Segall,114 F.2d 706, 709 (6th Cir. 1940), cert. denied 313 U.S. 562 (1941); Oesterreich v. Commissioner,226 F.2d 798, 802 (9th Cir. 1955)); (2) how the parties treat the transaction ( Oesterreich v. Commissioner,supra at 803); (3) whether an equity was acquired in the property ( Haggard v. Commissioner,241 F.2d 288, 289 (9th Cir. 1956); Oesterreich v. Commissioner,supra at 803; see Mathews v. Commissioner,61 T.C. 12, 21-23 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied *458 424 U.S. 967 (1976)); (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments ( Wiseman v. Scruggs,281 F.2d 900, 902 (10th Cir. 1960)); (5) whether the right of possession is vested in the purchaser ( Wiseman v. Scruggs,supra at 902; Commissioner v. Segall,supra at 709); (6) which party pays the property taxes ( Harmston v. Commissioner,61 T.C. 216, 229 (1973), affd. 528 F.2d 55 (9th Cir. 1976)); (7) which party bears the risk of loss or damage to the property ( Harmston v. Commissioner,supra at 230); and (8) which party receives the profits from the operation and sale of the property ( Harmston v. Commissioner,supra at 230). See generally Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976). * * * [77 T.C. at 1237-1238.] In Frank Lyon Co. v. United States,supra, a case heavily relied on by the petitioners, the *459 Supreme Court upheld the form of a sale-leaseback transaction and determined that a sale had occurred where there was (1) a genuine multiparty transaction (2) with economic substance (3) compelled or encouraged by business or regulatory realities and (4) the transaction was imbued with tax independent considerations, not shaped solely by tax avoidance features that have meaningless labels. See Dunlap v. Commissioner,74 T.C. 1377, 1433-1437 (1980); Hilton v. Commissioner,74 T.C. 305, 347 (1980). [27]
*460 After careful examination of all the facts and circumstances herein, we hold that the transaction effectuated pursuant to the "Inventory Sale Agreement" dated January 31, 1975, constitutes a sale for tax purposes. The record here is substantial and covers a broad spectrum of corporate activities over a long period of time. We recognize that the transaction was effectuated, and certain documents were prepared, with the usual close scrutiny of respondent in mind, and we have weighed certain evidence accordingly. Our conclusion, however, is based upon the totality of the facts and circumstances. We think the substance of the "Inventory Sale Agreement" is consistent with its form and we conclude that on January 31, 1975, HSM and related subsidiaries sold its intercompany inventory to PHS. PHS, a wholly owned subsidiary of Field Enterprises, and HSM are two unrelated corporations. Each party was represented by independent counsel and the "Inventory Sale Agreement" was the final product of extensive negotiations and at least 16 prior drafts. There is no suggestion of collusion between the unrelated parties; enforceable contractual rights and obligations are thus created in HSM *461 and PHS. Cf. Frank Lyon Co. v. United States,supra, where Frank Lyon, majority shareholder and board chairman of "buyer" Frank Lyon Co., served on the board of directors of "seller" Worthen Bank & Trust Company, although this did not affect the outcome of the case. [28]
As a preliminary matter, we are faced again with respondent's renewed objection as to the admission of certain testimony. He contends, in his response to petitioners' pretrial memorandum and brief, that there is no reason to look beyond the written terms of the "Agreement" to determine the rights and obligations of the parties, i.e., the parol evidence rule precludes certain testimony as to rights and obligations of the parties. Williston defines the parol evidence rule as requiring: in the absence of fraud, duress, mutual mistake, *462 or something of the kind, the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated writing. * * * [4 Williston, Contracts, sec. 631, p. 949 (3d ed. 1961).] Corbin summarizes the parol evidence rule as follows: When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. [Corbin, Contracts, sec. 573, p. 357 (1960).] In Estate of Craft v. Commissioner,68 T.C. 249 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979), we summarized two approaches this Court has taken in regard to the parol evidence rule. Under the "third-party to the instrument rule" we have held that since the Commissioner was not a party to the instrument, whether it be a trust, will or contract, neither he nor the taxpayer may rely on the rule to exclude extrinsic evidence. See Estate of Craft v. Commissioner,supra at 260, and *463 cases cited therein. Under "the State law approach" we have looked to and followed the applicable State law regarding the admissibility of extrinsic evidence. See Estate of Craft v. Commissioner,supra at 261, and cases cited therein. In cases where we must make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence concerning those rights and interests. In cases not involving such a determination but rather where we are concerned with the proper allocation (or character) of amounts paid under a contract, i.e., "not concerned with ownership of the property interest but with the true reasons for and behind its receipt by the owner", we will apply the "third party to the instrument rule". See Estate of Craft v. Commissioner,supra at 263. Here, we must apply the State law approach and the controlling State law, as set forth in the Agreement, is that of Illinois. The primary object of the construction of a contract, as stated by the Supreme Court of Illinois, is to give effect *464 to the intention of the parties. Martindell v. Lake Shore National Bank,15 Ill. 2d 272, 154 N.E. 2d 683 (1953). Accordingly, extrinsic evidence is admissible under Illinois law to show the meaning of words or clauses used in a contract where there is an ambiguity or where the language is susceptible of more than one meaning. Martindell v. Lake Shore National Bank,154 N.E. 2d at 689; Richards v. Liquid Controls Corporation,26 Ill. App. 3d 111, 325 N.E.2d 775, 781 (2d Dist. 1975). If the contract is not complete or if the language of the instrument is ambiguous or uncertain, then "* * * extrinsic evidence may be introduced to expand or interpret the document, as the case may be". Weiland Tool & Manufacturing Co. v. Whitney,44 Ill.2d 105, 251 N.E.2d 242, 247 (1969); see also Mayol v. Weiner Companies, Ltd.,98 Ill. App.3d 985, 425 N.E.2d 45 (4th Dist. 1981). After examining the "Inventory Sale Agreement" in detail, paying particular attention to Section 1.2, which sets forth the "Purchase Price" due HSM and the "Exact Amount Due" PHS, and the adjustment mechanism provided for in Sections 1.5 and *465 1.6, we are confident that an Illinois court would admit extrinsic evidence, including testimony as to intent, in determining certain rights and obligations of the parties. We turn now to the important factors considered in deciding whether a sale of the intercompany inventory occurred between HSM and PHS. 1. Risk of Loss
Petitioners first contend that based upon provisions in the contract and the clear intent of the parties, PHS bore a risk of loss in effectuating the transaction, an indicative factor in determining that a sale occurred. See, e.g., Estate of Stranahan v. Commissioner,472 F.2d 867 (6th Cir. 1973). Respondent contends that PHS bore no risk of loss. We agree with petitioners. The Agreement provides: Section 1.1 Sellers hereby sell, transfer, assign and deliver to Buyer, and Buyer hereby purchases and acquires from Sellers, as of the close of business on the Sale Date, all the Intercompany Inventory then owned by Sellers. Section 1.2 The purchase price for the Intercompany Inventory shall be an amount equal to the dollar value of such Intercompany Inventory shown on Seller's books and records as of the Sale Date, adjusted, *466 as provided in Section 1.3B, by a physical inventory to be taken by Sellers as of the close of business of each store of the Sellers on the Sale Date less a fee of $285,000, which fee includes interest as well as risk of obsolescence ("Purchase Price"). The Purchase Price plus the fee is hereinafter referred to as the "Exact Amount Due". Sellers warrant that Purchase Price will be not less than $20 million nor more than $30 million. Section 1.7 The parties hereto acknowledge that the Intercompany Inventory is sold to Buyer finally and irrevocably and that Sellers do not guarantee the saleability of such Intercompany Inventory. HSM determined that the value of the intercompany inventory, as reflected on HSM books, was $30,285,000 and therefore the purchase price was $30 million, the maximum amount under the agreement. [29]
*467 Respondent argues that PHS was not unconditionally obligated under the Agreement to pay the "purported" purchase price. The Agreement provides in Subsection A of Section 1.3 that: Simultaneously with the signing of this Agreement, Buyer shall pay $5,000,000 to HSM. Buyer shall at the same time execute and deliver to HSM a promissory note payable to the order of HSM in a principal amount equal to the maximum Purchase Price of $30,000,000 less $5,000,000. The promissory note for $25,000,000 shall be dated January 31, 1975 and shall be dated January 31, 1975 [sic] and shall be in the form of Exhibit III attached hereto. The promissory note, an executed copy of which was provided by PHS to HSM and an unexecuted copy of which was attached to the Agreement as Exhibit III, provided that: FOR VALUE RECEIVED, PHS FINANCE CORPORATION * * * ("Maker"), hereby promises to pay to HART SCHAFFNER & MARX * * * ("Payee"), the principal amount of $25,000,000, without interest, in accordance with the following schedule of percentage payments of such principal amount: Percentage
On or before
During the Period
Cumulative
March 17, 1975
25%
25%
April 15, 1975
20%
45%
May 15, 1975
15%
60%
June 16, 1975
10%
70%
July 15, 1975
10%
80%
August 15, 1975
10%
90%
September 15, 1975
10%
100%
*468 In view of the above relevant sections of the Agreement and the promissory note given to HSM by PHS, we think PHS was unconditionally obligated to pay the full purchase price of $30 million whether or not the inventory was eventually sold to consumers.This conclusion is buttressed by the testimony of John R. Meinert, executive vice president and board director of HSM and principal negotiator of the Agreement on behalf of HSM, and Alexander Hehmeyer, executive vice president and general counsel of Field Enterprises[30] and principal negotiator of the Agreement on behalf of PHS. Both testified that the intent of the parties was, and their view of the Agreement they negotiated was, that HSM was entitled to receive, and PHS was obligated to pay, the full purchase price, i.e., $5 million paid immediately upon execution of the Agreement plus full payment of the promissory note, regardless of whether the proceeds from sale at retail exceeded that amount. Respondent points *469 out that the promissory note executed by PHS to HSM for the balance of the purchase price was expressly made non-assignable, non-negotiable, and subject to the terms of the Agreement. Respondent further points out that the promissory note executed by PHS for a loan from First National Bank of Chicago in the amount of $5,750,000 on January 31, 1975, contained no limitation on assignability or negotiability and no condition on its enforcement. We observe that the promissory note to HSM provided that: "This Note shall be payable only to the above named Payee and shall not be assignable or negotiable without the prior written consent of Maker." (Emphasis supplied.) This sentence does not, however, indicate that payment on the note was conditional. A provision limiting assignability and negotiability (in this case a limitation imposed unless there is prior written consent by PHS) is not uncommon in the business world. Indeed, such a provision is practical and common in promissory notes and is the subject of negotiation between parties. Similarly, we draw no inference from the assignable and negotiable character of the promissory note to the First National Bank of Chicago from *470 PHS.Again a provision as to assignability and negotiability, or lack thereof, is the subject of negotiation and the absence of a provision restricting assignability and negotiability is certainly understandable where a bank, an entity not unfamiliar with the trading and selling of such notes, is the holder of the promissory note. We also draw no inference from the following provision contained in the promissory note from PHS to HSM and not contained in the promissory note from PHS to the First National Bank of Chicago: This Note is issued pursuant to, and subject to the provisions of, the Inventory Sale Agreement dated January 31, 1975 between the Maker, Payee and certain other parties, and this Note is subject to payment, in whole or in part, as specified in such Agreement including the provisions thereof with respect to revision of the payment dates or amounts. * * * Clearly, the desired matching of payments from PHS to HSM with payments from HSM to PHS so as to preserve the intended "net payment" schedule, could not be ensured without the promissory note, an essential part of the Agreement, containing the above provision. This in no way implies, however, that the total payments *471 due HSM are conditional, particularly in light of our view that the relevant provisions of the Agreement provide that payment by PHS of the purchase price is absolute. By contrast, there is no need for such a provision to be included in the promissory note from PHS to the First National Bank of Chicago since the loan was in effect a separate transaction unrelated to the Agreement involving only the Bank and PHS. Respondent subtly points out that the promissory note to First National Bank is guaranteed by Field Enterprises but the promissory note to HSM lacks such a guarantee provision. Respondent also subtly points out that on January 31, 1975, the total capital of PHS consisted of $50,000. [31] Again, the inference respondent wishes us to draw is unwarranted. Earlier drafts of the Agreement listed Field Enterprises as the purchaser. PHS was formed and used in the Agreement to avoid subjecting Field Enterprises to lawsuits (including lawsuits against its newspaper division) in states in which Field Enterprises did not at that time do business and which intercompany inventory was located and would be sold. There is no suggestion in the record that Field Enterprises would not *472 have paid for the inventory and that HSM did not have recourse against Field Enterprises. [32]
Respondent relies on Tyler v. Tomlinson,414 F.2d 844 (5th Cir. 1969), and Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976), for the proposition that no sale occurred between HSM and PHS since there was no source of payment of the PHS promissory note to HSM other than the eventual proceeds of the inventory purportedly sold. However, as we said above, PHS was unconditionally liable on the promissory note and in the event the inventory *473 was sold at a lower price than the purchase price, a source of payment of the funds would be Field Enterprises, a corporation with a net worth over $100 million. Thus, respondent's reliance on those cases is misplaced. Respondent next contends that under the Agreement HSM is unconditionally obligated to pay PHS $30,285,000 whether or not the inventory was eventually sold at retail, the opposite of his position with respect to the liability of PHS on its note to HSM. [33] It is his position that the "Exact Amount Due", the amount HSM pays PHS, is an absolute liability of HSM to PHS, and therefore even if PHS is unconditionally obligated to pay the purchase price ($30 million), it still cannot incur a loss since it will receive an amount in excess of the purchase price. Section 3 of the Agreement provides that: "Buyer hereby appoints Sellers as its agents, effective at the opening of Sellers' respective stores for business February 1, 1975, for the sole purpose of selling the *474 Intercompany Inventory in each of such stores at retail to the ultimate consumer." As agent, HSM (and its retailing subsidiaries and retailing division) was obligated to use its best efforts to sell the inventory at its full retail price and was obligated to remit only the "Exact Amount Due" thereby keeping the balance of the proceeds as payment for expenses and payment for agency. Under Section 1.2 of the Agreement, the "Exact Amount Due" is equal to the "Purchase Price" plus the "fee", $285,000. As we said above, it was determined that the purchase price be $30 million and accordingly the "Exact Amount Due" was designed to be $30,285,000. However, in contrast to Section 1.3 of the Agreement which specifically sets forth unconditionally and without reference to sales how the purchase price was to be paid, Section 1.4 provides: The Settlement Schedule is shown on Exhibit IV attached hereto, [34] The term "settlement period" refers to the time periods specified in Column 1 of Exhibit IV. The term "settlement date" refers to the dates specified in Column 2, of Exhibit IV. On each settlement date, commencing with March 17, 1975, HSM shall remit to Buyer, by payment through *475 the First National Bank of Chicago, an amount equal to the percentage especified in Column 3 of Exhibit IV of the Exact Amount Due. Each of said percentages represents Seller's forecasts of approximate sales of Intercompany Inventory (which shall be sold by Sellers as agents for the Buyer) during the settlement period immediately preceding such settlement date. [Emphasis supplied.] Mr. Meinert testified that it was the clear understanding of the parties that under the Agreement if the sale proceeds from the sale at retail of the intercompany inventory to consumers were less than the $30 million, e.g., if the sale proceeds were $25 million, PHS would be entitled to receive only the sale proceeds, although still obligated to pay $30 million. Mr. Stewart, vice president and general counsel for HSM and principal draftsman of the Agreement, also testified that it was the clear understanding of the parties, and the Agreement was drafted accordingly, that the obligation of HSM under the Agreement was to pay the proceeds from the sale at retail of the inventory and the obligation was not to pay a specific stated sum, i.e., not to pay the specific *476 $30,285,000 in all events.
In order to find that payments from HSM to PHS of the "Exact Amount Due" were related to retail sales proceeds and were not absolute, we rely not only on the above relevant provisions of the Agreement but also on the clear, uncontradicted testimony as to intent of the parties. Section 1.5 of the Agreement [35] provides the mechanism by which an adjustment in the payments from HSM to PHS can be made so as to reflect actual sales and, as provided in Section 1.6 of the Agreement, a supplemental Exhibit IV setting forth HSM's estimate of future sales is substituted for the prior Exhibit IV. Thus, the scheduled $30,285,000 "Exact Amount Due" is based upon an estimate of sales and therefore HSM is not obligated to pay that total amount, according to the Agreement, under all circumstances. According to the last sentence of Section 1.6, if the dollar amount of inventory on hand is greater than the book value as of January 31, 1975 (less amounts previously remitted by HSM) then HSM may "reduce the next payment to Buyer by the amount of such difference". The adjustment provisions were the device for preventing payment of the "Exact Amount Due" if it exceeded proceeds *477 of sales of the inventory at retail. *478 Respondent correctly points out that under Section 1.6 of the Agreement, if Exhibit IV is adjusted or if any scheduled payment from HSM to PHS is reduced to reflect sales proceeds, the payments due under Exhibit III (payments from PHS to HSM) are to be correspondingly reduced.This provision, however, is intended to preserve the matching of payments, i.e., the "net payment" schedule, during the period which inventory still remains or until PHS exercised its right under Section 4.1 of the Agreement to terminate the agency, but is not intended to balance total payments. Thus, the pertinent language in Section 1.6, that "payments due under Exhibit III shall be correspondingly adjusted to conform to the schedule but in a manner so that the same dollar amount of the excess payments in the original Exhibit IV over the original Exhibit III will be maintained and paid to Buyer on each of the dates specified" is aimed at cash flow and timing of payments but does not alter the ultimate outcome that, when the dust settles, PHS is unconditionally obligated to pay HSM $30 million and HSM may pay PHS, depending on the actual sales proceeds at retail and election of adjustment, an amount *479 less than $30,285,000. [36]
The considerations involved in deciding whether to call for an adjustment are reflected in interoffice memoranda to and from Mr. Stewart prepared prior to the final remittance due under the Agreement. Although sales at retail to consumers were not as brisk as anticipated, proceeds were viewed as adequate and *480 calling for an adjustment, according to such memoranda, would jeopardize future profits. Accordingly, HSM did not call for an adjustment although such an adjustment was within its rights. The intent of the parties, as reflected in the testimony of all those who were the principal negotiators on behalf of PHS and HSM and the principal draftsman of the Agreement, was that PHS bore risk of loss on the transaction. As stated by Mr. Hehmeyer in explaining the risk of loss that PHS was exposed to under the Agreement, "* * * the purchase price was $30 million. If that merchandise had not been sold, PHS finance would still have had to pay Hart, Schaffner & Marx for it". Petitioners contend, citing Estate of Stranahan v. Commissioner,472 F.2d 867 (6th Cir. 1973), that once it is established that risk in fact exists, we should not examine the degree of risk PHS incurred. We disagree with the contention that risk of loss, no matter how small and no matter how remote and speculative, is a risk indicating sale. However, based upon the large amounts of money and inventory involved, the volatility of the product sold at retail to consumers, and the constant unpredictable *481 changes in the economy, we think PHS bore a risk sufficient to be indicative of a sale notwithstanding the purchase price of $30 million for intercompany inventory with a book value of $30,285,000. There are "simply too many contingencies including variations" in the retail price of the inventory and cost of money, see Frank Lyon Co. v. United States,435 U.S. 561 (1978), to conclude that PHS could suffer only a relatively insignificant loss or that the chance of loss was so remote that it was no chance at all. Cf. Estate of Stranahan v. Commissioner,supra at 871.
2. Opportunity for Profit
Petitioners also contend that PHS had an opportunity to profit from the transaction (other than from the $285,000 fee) by taking the inventory free and clear of the rights of HSM. [37] Respondent, on the other hand, maintains that PHS had no opportunity to profit because it was entitled to receive only the Exact Amount Due from HSM. Thus, respondent contends, HSM retains all the profits on sale at retail in all events. Again, we agree with petitioners. *482 Section 4.1 of the Agreement, a section apparently ignored by respondent on brief, provides that: Buyer shall have the right to terminate Sellers' agency for the resale of the Intercompany Inventory under this Agreement at any time. In the event of such agency termination, Buyer shall have the right, after 10 days' notice of its intention to terminate the agency, to remove all unsold Intercompany Inventory from Sellers' stores. Thus, at any time PHS could terminate the agency, claim the goods, and ship them to a discounter or any other retailing operation. The fear of this absolute power of PHS to terminate the agency relationship and remove the inventory is evidenced throughout the record. Mr. Meinert was particularly concerned with the power of PHS to ship to discounters first line, first season goods (high quality goods in the current season generally carried by high quality stores). Interoffice memoranda to and from Mr. Stewart prepared prior to the first remittance due under the Agreement detail the strategy employed by HSM of not calling for an adjustment, although sales were not as brisk as anticipated, because such an adjustment would have caused PHS to terminate *483 the agency and remove the remaining inventory. Mr. Meinert, Mr. Stewart, and Mr. Dorf, vice-president and controller of HSM, believed that under the Agreement PHS could at any time remove and sell elsewhere the most valuable inventory remaining ("the cream of the crop, the best of the inventory still there") and, because of this belief, HSM consistently acted accordingly. Respondent points out that the inventory was eventually sold for approximately $60 million and then rhetorically asks if PHS had the power, or everyone believed it had the power, to terminate the agency, why did it not exercise such power and remove the inventory. [38]
Under the agency arrangement HSM was to absorb all expenses incurred in selling the inventory. Thus, although eventual sales to consumers produced $56,529,380 in proceeds by January 31, 1976, the difference between that amount (plus the value of inventory remaining on that date) and $30,285,000 is not the additional profit, as respondent implies, which PHS automatically *484 would have received had it removed the inventory at the outset and sold it to another retailing operation. At some point, considering fixed and variable costs, price fluctuations and various potential financial relationships with other retaining operations, it would have become considerably profitable for PHS to terminate the agency with HSM and remove the inventory, but that point was never reached during the time period covered by the Agreement. If the point at which it does become reasonably profitable to terminate the agency and remove the inventory is not within the realm of reality, then, of course, the purported opportunity for profit is in substance no opportunity at all. Cf. Grodt and McKay Realty, Inc. v. Commissioner,77 T.C. at 1241-1242. However, such is not the case here in light of the large quantity of inventory sold and therefore the potential for large swings in total value, the amount of money involved, the business capabilities of Field Enterprises, parent of PHS, to handle agency terminations if faced with a better profit opportunity, and the numerous contingencies and unexpected events that continually affect the business world. Cf. Frank Lyon Co. v. United States,supra at 579. *485 The fact that a profit for PHS in excess of $285,000 did not materialize does not mean that a potential profit in excess of that amount did not exist. See Estate of Stranahan v. Commissioner,supra at 871. Assessment of the opportunity for profit is made at the time the Agreement is entered into. If conditions dictated in the business judgment of PHS that it would be beneficial for PHS, a corporation totally unrelated to HSM, to terminate the agency, it had the ability to do so, and we have no doubt that it would have done so. In our judgment PHS had, at the time it entered into the Agreement, a realistic opportunity for profit in excess of $285,000 and the mere failure to realize that profit does not alter our view. 3. Intent of the Parties
The parties clearly intended that the transaction be a sale and consistently treated it as such. In addition to the intent already revealed by our discussion, this view is supported by the unqualified testimony of representatives and officials of both PHS and HSM. [39] Other facts and circumstances also show the intent of the parties to consummate a sale. *486 The HSM bulletin dated January 24, 1975, instructed store presidents and controllers to make estimates of inventory on hand for each store for January 31, 1975, and to report immediately such information; and Bulletin No. 1603, issued February 7, 1975, instructed store presidents and controllers to report the exact amount of inventory on hand as of January 31, 1975. Thus, in contrast to mere approximations based upon less recent books and records, HSM required accurate inspection at each store first to have the best estimate available right up to the date of the Agreement and then to record absolutely the exact inventory purchased by PHS. In order to identify and segregate each price of inventory purchased by PHS, price tickets of all merchandise received by retail stores subsequent to January 31, 1975, were marked with an "X" or other symbol. [40]
Identification and segregation was also a concern to PHS. Due primarily to Mr. Hehmeyer's insistence as principal negotiator on behalf of PHS, a provision as to merchandise identification was included in the Agreement. *487 See Section 3.A of the Agreement, supra. Mr. Stauffacher, chief executive officer of Field Enterprises, insisted that there be an inspection of the merchandise to make sure that the identification and segregation requirements were being followed. Accordingly, Mr. Pilch, treasurer of Field Enterprises, and Mr. Stolle, a new executive vice president of Field Enterprises, visited the flagship Baskin Clothing Store in Chicago and observed the inventory marking and identification. The necessity for accurate estimates and records, the desire for identification and segregation, the techniques eventually used to designate PHS inventory and the inspection of such techniques by officials of PHS indicate that the parties intended to consummate a sale. 4. Consistent Treatment by Parties Bearing on Intent
Financial records maintained by the parties evidence their intent to treat the transaction as a purchase. In accordance with Bulletin No. 1603, each retailing subsidiary in reflecting the transaction made an entry to decrease their inventory accounts and increase their accounts receivable by the amount of inventory on hand as of January 31, 1975, and also recorded a proportionate *488 share of the $285,000 loss. Thus, each retailing subsidiary recorded the transaction as if a proportionate share of the $30,285,000 book value of inventory was sold for a proportionate share of $30 million. Subsequent entries were made only to simplify and coordinate the accounting procedures for sales by the retail stores of all merchandise, including the intercompany inventory, to consumers. The transaction was not recorded as an outright sale only because it had always been the practice of HSM and its auditing firm not to reflect as sales revenue the sale of assets not in the normal course of business. The balance sheets of PHS also reflect an intent to treat the transaction as a sale. The balance sheet of January 31, 1975, reflects "Inventory" in the amount of $30,285,000 and subsequent monthly balance sheets reflect that amount less the exact dollar amount of property due from HSM pursuant to the original repayment schedule under the Agreement. Respondent points out that once PHS had been repaid, the inventory disappeared from its financial statements "notwithstanding that several millions of dollars worth was still unsold." As indicated in our findings of fact, mutual *489 or reciprocal crediting of the accounts of HSM and PHS at First National Bank at Chicago took place on the various settlement dates. Such reciprocal crediting reflected payments of the Exact Amount Due to PHS and payments on the promissory note to HSM with the result that the transaction was fully consummated and closed out on September 15, 1975. The last monthly balance sheet of PHS showing inventory was the balance sheet of August 31, 1975, although as of January 31, 1976, HSM and its retail subsidiaries still had $4,288,266 of inventory, as valued on the books and records of the respective entities, which had not been sold to consumers. The disparity between the amount of inventory not sold to consumers and the amount of inventory per the books of PHS, however, merely reflects the fact that payments proceeded as initially planned, i.e., neither party called for an adjustment and PHS did not terminate the agency, and not an inconsistency indicating the transaction was in substance a loan. Under the Agreement, PHS was entitled to payments for the inventory in accordance with the schedule of payments of the Exact Amount Due. Accordingly, the value of the remaining inventory to *490 PHS necessarily corresponds to the amount of inventory for which PHS was still entitled to receive payment, notwithstanding that some of the inventory was still unsold to consumers. As of January 31, 1975, that value was $30,285,000, as of August 31, 1975, that value was $3,028,500 since no adjustment was called for, and as of September 30, 1975, that value was $0 since the transaction was fully consummated without adjustment on September 15, 1975, and after that date PHS no longer owned inventory for which it was entitled to receive payment. 5. Nontax Considerations
Considerations unrelated to tax consequences also indicate that the transaction was in substance a sale and not a loan. Both the "Bank Credit Agreement", the agreement in which HSM arranged to borrow $35,000,000 from 16 banks, and the "Loan Agreement," the agreement in which HSM arranged to borrow $12,000,000 from the Equitable Life Insurance Society of the United States, prohibited HSM from incurring or creating any pledge, mortgage, assignment or other encumbrance upon any of its assets or property, e.g., the intercompany inventory. Thus, if the parties had intended a loan and not a sale, HSM would have been *491 in default on these loan agreements the effect of which, according to officials of HSM who were quite aware of the above prohibition, would have been "disastrous." The loan agreements also required that in each 2-year period HSM be free of unsecured short term indebtedness under lines of credit for a consecutive period of 45 days. This requirement was satisfied during January and February of 1974. However, in order to avoid the possibility of default under either of these loan agreements, it was HSM's practice to try to satisfy the short term debt free 45-day period every year. HSM also tried to eliminate short term debt every year for a consecutive period of 45 days because Standard & Poors and Moody's looked favorably upon such an undertaking which thereby favorably affected bond rating and interest costs. Due to increased cash flow, HSM found it easiest to eliminate short term debt during the month of January and February. As indicated in our findings of fact, financial conditions made it difficult for HSM to eliminate short term debt during the period of January through February 1975. Inventories had "peaked" during this period, according to Mr. Meinert, earnings were *492 decreasing and HSM was faced with a recession "which was the worst one for [its] industry and the company since the Great Depression." [41] Notwithstanding that during 1974 it raised $5 million in cash by selling 22 stores, major steps were taken by HSM in light of these financial conditions including, inter alia, the reduction of the quarterly dividend from $.22 a share to $.15 a share representing the first dividend reduction in 25 years, the imposition by management of stringent economies whereby expenses, hiring, capital expenditures and repairs were cut back, and the sale of accounts receivable to the First National Bank of Chicago thereby raising $2 million in cash.[42] It was within this financial climate that HSM chose to sell its inventory to PHS for $30 million thereby eliminating short term debt for a consecutive period of 45 days and improving its financial condition. *493 The statements prepared by Price Waterhouse & Co. advising HSM that they had obtained no knowledge of default by HSM in the performance of the pertinent sections of the "Bank Credit Agreement" and the "Loan Agreement" are not relevant in determining whether HSM was legally in default. Those statements are relevant, however, in determining the intent of the parties, that is the intent of HSM to consummate a sale with PHS and not a loan. Provisions of both loan agreements specifically required that timely written statements be furnished by independent certified public accountants to the effect that no default occurred to their knowledge. Officials of HSM were quite aware of these provisions and quite conscious of the serious consequences if such statements were not furnished as provided for in the respective loan agreements. A copy of the statement prepared in accordance with the "Bank Credit Agreement" was sent to the 16 banks and a copy of the statement in accordance with the "Loan Agreement" was sent to the Equitable Life Insurance Society of the United States. Accordingly, the influence and effect of the requirement that these statements be furnished, and their ultimate issuance, *494 show an intent to consummate a sale and not an intent to consummate a loan. [43]
Respondent directs our attention to the fact that the "Loan Agreement" was amended on four different occasions by a "First, Second, Third and Fourth Supplemental Agreement" and infers that breach of the above provisions would result only in another amendment. Respondent's inference once again is unwarranted and based upon pure speculation. Preliminarily we note that the "Bank Credit Agreement" was not subject to these supplemental agreements.The supplemental agreements were not related in any way to Sections 9.5 or 9.8 of the Loan Agreement. HSM consistently employed financial maneuvers in consideration of the "Loan Agreement" (as well as in consideration of the "Bank *495 Credit Agreement" and the bond rating by Standard & Poors and Moody's) and officials of HSM were aware of the pertinent provisions and the significance of default. Moreover, there is nothing in the record which even remotely suggests that the Equitable Life Insurance Society would relieve HSM from the pertinent default provisions. Respondent contends that in order to eliminate short term debt for the consecutive period of 45 days during the pertinent taxable year HSM could have taken measures other than selling the intercompany inventory to PHS. A transaction, however, is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 148 (1974). Tax laws affect the shape of nearly every business transaction. See Frank Lyon Co. v. Commissioner, 435 U.S. at 580; Commissioner v. Brown,380 U.S. at 579-580 (Harlan, J., concurring). The fact that a transaction is arranged so as to produce favorable tax consequences does not signify that the substance of the transaction is other than what it appears to be in *496 form, Edwards v. Commissioner,415 F.2d 578 (10th Cir. 1969), cf. Templeton v. Commissioner,66 T.C. 509, 513 (1976), affd. per curiam 573 F.2d 866 (4th Cir. 1978); nor does it mean that the parties intended a different path in light of a perhaps better, tax independent, solution; nor does it give the Commissioner the right to recast the transaction. Gyro Engineering Corp. v. United States,417 F.2d 437 (9th Cir. 1969). HSM exercised its right to sell the intercompany inventory to PHS and the appropriateness of this action in comparison with other business strategies is not for us to decide. Respondent points out that despite language in the Agreement to the effect that "all" intercompany inventory was being sold, that part of the inventory (Great Western goods) in which there was no element of profit was in fact excluded and not sold. We note that the maximum amount of inventory under the Agreement was sold to PHS for the maximum purchase price. Great Western represented an insignificant manufacturing subsidiary which later closed. [44] Moreover, in determining which inventory and how much inventory to sell PHS, *497 it was not improper for HSM to consider tax consequences. Again, we would be ignoring reality if we found that the sale of property which results in favorable tax consequences is somehow tainted by the decision not to sell property which would not produce those favorable tax consequences. Cf. Frank Lyon Co. v. United States,435 U.S. at 580. Respondent argues, in support of his position that the transaction was in substance a loan, that the fixed "fee" of $285,000 agreed upon by HSM and PHS is the equivalent of interest on $5 million and directs our attention to a memorandum which refers to, and includes calculations based upon, the 9-1/2 percent prime rate in effect on January 31, 1975. The Supreme Court, however, rejected this very argument in its decision in the Lyon case and recognized that it is "natural" to analyze and evaluate business undertakings in terms of cost *498 of funds. Frank Lyon Co. v. United States,supra at 576. Respondent contends that the failure by the parties to comply with the requirements of the Bulk Sales laws demonstrates that the Agreement was never intended to constitute a true sale of inventory. Respondent does not ask us to adjudicate applicability of the bulk sales provisions of any State but he seeks only to demonstrate the existence of potentially serious legal problems all of which were nonexistent if the transaction was in substance a loan. Respondent also maintains that the attitude of counsel for HSM evidences a total disregard for these problems, demonstrating again that the intent was to consummate a loan and not a sale. Section 5.1 of the Agreement, another section apparently ignored by respondent on brief, provides: HSM and each of the Retail Subsidiaries, jointly and severally, agree to protect, defend and hold Buyer harmless against all liabilities, claims and obligations, including all costs and expenses with respect to such liabilities, claims and obligations, resulting from failure to comply with the provisions of the Bulk Sales Act of any state arising out of the sale of the *499 Intercompany Inventory; * * *. Insertion of this provision in the Agreement belies respondent's contention that the parties demonstrated a lack of concern for the Bulk Sales Acts. Furthermore, if the transaction effectuated under the Agreement was intended to be a loan collateralized by the inventory, insertion of such a provision would be unnecessary as well as inconsistent. See Section 6-103(1) of the Uniform Commercial Code which excepts from Article 6 transfers made to give security for the performance of an obligation. [45] Cf. Section 9-111 Uniform Commercial Code. The testimony of Mr. Stewart, counsel for HSM, hardly "evinced * * * a wholly nonchalant attitude toward the entire question." Mr. Stewart testified that the Agreement: [W]as a contract in which, although we were selling inventory, and in some of the stores perhaps selling a *500 high enough percentage that bulk sales compliance would have been appropriate, it's not necessary. It's not mandatory and it would have served no useful purpose. The general purpose, of course, of the bulk sales statute, is to protect the purchaser of inventory against claims that creditors of the seller might have in that inventory. And in this case, we were, of course, able to assure and warrant title which we did in part two of the agreement, that we were conveying good title and it seemed superfluous to try to go through the motions, as long as we did guarantee. * * * I might add, if I may, that it's common to waive compliance with bulk sales when you have such a guarantee between responsible parties. This again demonstrates that the problems related to the Bulk Sales Act were considered and appropriate solutions reached. [46]
*501 Respondent also contends that the failure of PHS to obtain any certificate of authority to do business as a foreign corporation in the various states demonstrates that the parties never intended a sale. Respondent again does not ask us to adjudicate PHS' need for a certificate of authority but he seeks only to point out potentially serious problems if the transaction was in substance a sale and not a loan and contends that such problems were not considered by the parties. Like his contention with respect to the Bulk Sales Act, evidence presented in the record belies respondent's contention. Earlier drafts of the Agreement were drafted with Field Enterprises as the purchaser. PHS was specifically formed, in part, to avoid subjecting Field Enterprises to lawsuits (including libel suits against its newspaper division) in states in which Field Enterprises did not at that time do business and in which intercompany inventory was located and could be sold. In this regard evaluation of the problems associated with "doing business" in each of the states was presented in a memorandum from Mr. Hehmeyer to Mr. Stauffacher. This evaluation, prepared at the time Field Enterprises was considered *502 to be the purchaser, concludes that: [T]he chances are (famous last words) that the "doing business" by FE in the 25 HSM states would never be discovered. But if it were (and states are rapidly developing computer fed "information" exchanges), a host of problems would arise - probably not major but easily a colossal collection of time and cost consuming legal, accounting and tax nuisances. Accordingly, PHS was formed in lieu of attempting to qualify Field Enterprises in each of the states and the problems which could have arisen with respect to its failure to qualify were considered. Hence, in the business judgment of representatives of PHS, qualification in each state was not justified. This analysis hardly suggests a lack of concern for the problems associated with "doing business" in each state [47] and exhibits, contrary to respondent's contention, a consideration of these problems in detail and an intent to consummate a sale and not a loan. [48]
*503 Respondent finally contends that any reliance upon Frank Lyon Co. v. United States,435 U.S. 561 (1978), is misplaced and that Helvering v. Lazarus & Co.,308 U.S. 252 (1939), is controlling because the present case lacks a multiparty transaction. Our reading of those cases, both of which involve factual scenarios quite different from the present case, is that the third party merely ensures the economic substance of the transaction. Here the "Bank Credit Agreement" and the "Loan Agreement" sufficiently ensured the economic substance of the transaction. Whatever reliance we have placed upon FrankLyon Co. v. United States,supra, is unaffected by the factual distinctions between that case and Helvering v. Lazarus & Co.,supra.See Wolfman, "The Supreme Court in the Lyon Den: A Failure of Judicial Process", 66 Cornell Law Review 1075, 1087-1088, 1099-1100 (1981). Respondent's characterization of the transaction as a loan no doubt has superficial appeal. This is especially true in light of the fact that no inventory was moved, transferred or relocated as a result of the Agreement. *504 Respondent fails to recognize, however, that HSM wore two hats--one as a manufacturing operation which manufactured men's clothing and another as a retailing operation which sold men's and women's apparel. The inventory was manufactured by the manufacturing operation, eventually sold to PHS, and then, after being sufficiently segregated and identified, sold by PHS to consumers with the retailing operation acting only as agent for PHS. We find that certain contractual rights and obligations were created by the Agreement in two unrelated parties, rights and obligations which we cannot ignore. Respondent has emphasized certain provisions of the Agreement and urges a literal interpretation without the benefit of parol evidence while at the same time he totally disregards certain other pertinent provisions.Our conclusion, however, is based upon the entire Agreement as well as the totality of the facts and circumstances. Accordingly, in view of the relevant contractual provisions, the risk of loss, the opportunity for profit, the clear intent of the parties, the consistent treatment by the parties and the nontax economic considerations, we hold that the transaction effectuated pursuant *505 to the Inventory Sale Agreement dated January 31, 1975, constitutes a sale of the intercompany inventory by HSM to PHS for Federal income tax purposes.
To reflect this conclusion and the agreement of the parties on other issues, Decisions will be entered under Rule 155.
Footnotes
1. Consolidated herewith are Wallach's, Incorporated, docket No. 16475-79; and Jack Henry Clothing Company, docket No. 16476-79.↩
2. These cases were tried before Judge Sheldon V. Ekman, who died on January 18, 1982. By order of the Chief Judge dated March 19, 1982, they were reassigned to Judge Howard A. Dawson, Jr.↩ for disposition.
3. On reply brief respondent has conceded that the initial inventory amount for Johnny Carson Apparel, Inc. should be zero, rather than $279,937 as set forth in the notice of deficiency. This adjustment can be given effect in the Rule 155 computations.↩
4. Exhibit IV, entitled "Forecast of Installment Payments Expressed as a Percentage of the Exact Amount Due Buyer Pursuant to Inventory Sale Agreement Dated January 31, 1975", provides: ↩
Cumulative by
the Close
In Respect of
of the
Settlement
the Indicated
Indicated
Settlement Period
Date
Settlement Period
Settlement
Period
(1)
(2)
(3)
(4)
February 1, 1975 through
Mar. 17, 1975
25%
25%
February 28, 1975
March 1, 1975 through
Apr. 15, 1975
20 45 March 31, 1975
April 1, 1975 through
May 15, 1975
15 60 April 30, 1975
May 1, 1975 through
June 16, 1975
10 70 May 31, 1975
June 1, 1975 through
July 15, 1975
10 80 June 30, 1975
July 1, 1975 through
Aug. 15, 1975
10 90 July 31, 1975
August 1, 1975 through
Sept. 15, 1975
10 100 August 31, 1975
5. According to Alexander Hehmeyer, PHS derived its name from Pilch (treasurer of Field Enterprises), Hehmeyer and Stauffacher (chief executive officer of Field Enterprises).↩
6. In this regard an evaluation of the problems associated with "doing business" in each of the states was presented in an early memorandum from Mr. Hehmeyer to Mr. Stauffacher prepared at the time that drafts of the Agreement were being drafted with Field Enterprises as the purchaser. ↩
7. A. Robert Abboud was at that time one of three top officers of the First National Bank of Chicago as well as a member of the Board of Directors of both Field Enterprises and HSM. Mr. Abboud later became Chairman of the Board of the First National Bank of Chicago.↩
8. The first paragraph of Bulletin No. 1603 provides: HS&M expects to file a consolidated federal income tax return for the fiscal year beginning February 1, 1975 and ending January 31, 1976. In connection with this, all intercompany inventory owned by our men's retail subsidiaries, except Great Western goods, was sold at the close of business on January 31, 1975 to a non-affiliated Finance Corporation. The estimated intercompany inventory amounts were used pursuant to your telegram replies to our request of this information. ↩
9. The requests for estimates in the bulletin dated January 24, 1975, included the "Great Western" goods while the requests in Bulletin No. 1603 specifically excepted such goods. The exception was made because their was no intercompany profit on the sale of the Great Western goods. Great Western was an insignificant manufacturing subsidiary which later closed.↩
10. Consistent with the practice of not reflecting the sale of assets not in the normal course of business as sales revenue, previous sales of approximately $4 million of inventory incident to the sale of 22 retail stores in 1974 were not recorded as sales.↩
11. For example, the amount due from HSM pursuant to the repayment schedule (Exhibit IV, see footnote 4, supra↩) by March 31, 1975, was $7,571,250 (25 percent of $30,285,000) and the "Inventory" reflected on the balance sheet of March 31, 1975, was $22,713,750 ($30,285,000 less $7,571,250).
12. Mutual or reciprocal crediting of the accounts of HSM (account No. 08-00406) and PHS (account No. 58-08642) at First National Bank at Chicago took place on the various settlement dates provided in the Agreement, with the result that the transaction was fully consummated and closed out on September 15, 1975. Letters authorizing such timely crediting were sent to First National Bank by Mr. Meinert on behalf of HSM and by Mr. Pilch on behalf of PHS.↩
13. Field Enterprises owned warehouses which apparently were available for storage of merchandise as of January 31, 1975, but it is unclear from the record if such facilities could store any or all of the intercompany inventory.↩
14. Mr. Meinert was particularly concerned with the power of PHS to ship to discounters first line, first season goods (high quality goods in the current season generally carried by high quality stores).↩
15. According to Mr. Meinert eliminating short term debt every year avoided the possibility of default because "you could not take a chance that if you missed a year, then it could be sort of sudden death the following year."↩
16. As reflected on the financial statements of HSM, inventories reached a high point of approximately $140 million for the fiscal year ended January 31, 1975, including the intercompany inventory, although for fiscal year ended January 31, 1974, such inventories reached $136,369,000. By fiscal year ended January 31, 1976, inventories were in the amount of approximately $119 million, slightly higher than the amount for fiscal year ended January 31, 1973. ↩
17. This was the first strike in 60 years by the Amalgamated Clothing Workers Union. According to a Form 10-Q filed by HSM with the Securities and Exchange Commission for fiscal quarter ended May 31, 1974, the "June 3-11, 1974 industry wide strike by Amalgamated Clothing Workers against the suit and coat industry affected three of the company's manufacturing divisions.The impact of this short strike on the results of operations was not material."↩
18. Bulletin No. 1586 entitled "Cash Conservation" dated December 27, 1974, issued to store presidents and controllers includes the following first paragraph: The economy is going through a serious recession which makes it imperative to conserve cash and to limit and postpone expenditures.The Company is initiating a new policy, effective immediately and continuing through 1975, of making no expenditures which can be avoided or postponed and limiting all other expenditures to absolute minimums. We ask that you administer this policy in your company so that no expenditure will be made if it can be avoided or postponed.
It was requested in Bulletin No. 1521, dated April 29, 1974, also issued to store presidents and controllers that any fixed asset addition, replacement or repair expenditures projected to exceed $200 be brought to the attention of the Retail Division for prior approval and in Bulletin 1586 it is stated that Bulletin No. 1521, CAPITAL EXPENDITURE AND MAJOR REPAIRS AUTHORIZATION PROGRAM, is hereby amended and any expenditure in excess of $100.00 must be brought to the attention of the Retail Division for prior approval. NO EXPENDITURE IS TO BE COMMITTED FOR UNTIL PRIOR WRITTEN APPROVAL IS OBTAINED. ↩
19. According to Mr. Meinert, the important date was February 18, and therefore the suppliers could be sent a check the weekend before that date and it would not clear until that Tuesday, February 18, on account of George Washington's Birthday falling on Monday, February 17. One such major supplier was Burlington Industries, Inc. and a check dated February 13, 1975, in the amount of $1,966,361.09 for invoices in the amount of $2,012,098.67 (there being a credit in the amount of $15,737.58) was sent to them. Of this $2,012,098.67, only $755,098.90 was not for invoices already due by February 8, the majority of the $2,012,098.67 due prior to January 29. ↩
20. We note that it was not unusual, however, for HSM or its subsidiaries to sell accounts receivable.↩
21. ↩
NAME
LOCATION
DATE OF OPENING
Rosenblatt
Portland, Oregon
February 22, 1974
B. R. Baker
Cleveland, Ohio
March 6, 1974
The Man Store
Asheville, North Carolina
March 14, 1974
Chas. A. Stevens
Rockford, Illinois
March 14, 1974
Stuckey's
Rockford, Illinois
March 14, 1974
Hanny's
Phoenix, Arizona
March 18, 1974
Field Bros.
Paramus, New Jersey
August 1, 1974
Liemandt's
Minneapolis, Minnesota
September 25, 1974
Wallach's
Boston, Massachusetts
October 18, 1974
Hastings
San Francisco, California
November 14, 1974
Wolf Bros.
Tampa, Florida
November 2, 1974
22. ↩
NAME
LOCATION
DATE OF CLOSING
Stark Bros.
Harrisburg, Pennsylvania
January 31, 1974
Wallachs-New York
Fordham, New York
March 16, 1974
F. B. Silverwood
Los Angeles, California
June 29, 1974
Goldberg's
Elkhart, Indiana
September 30, 1974
23. ↩
NAME
LOCATION
DATE OF SALE
Jack Fox and Sons
Hammond, Indiana
February 3, 1974
(1 store)
B. R. Baker
Cleveland, Ohio
April 30, 1974
(4 stores)
A. M. Davison
Flint, Michigan
April 30, 1974
(2 stores)
Stark Bros.
Harrisburg, Pennsylvania
April 30, 1974
(4 stores)
Jacob Reed
Philadelphia, Pennsylvania
April 30, 1974
(8 stores)
Small's
Lansing, Michigan
July 31, 1974
(2 stores)
Griegers
Michigan City, Indiana
August 3, 1974
(1 store)
24. Mr. Stewart, principal draftsman of the Agreement, drafted or assisted in the drafting of the pattern of agreements which HSM and its subsidiaries followed in the sale of accounts receivable.↩
25. The parties agree that the only issue remaining for our decision is whether there has been a sale or other disposition of the intercompany inventory pursuant to the Agreement dated January 31, 1975. Resolution of this issue will correspondingly affect the LIFO inventory reserves for fiscal year ended January 31, 1975, for petitioner Wallach's Inc., docket No. 16475-79, and petitioner Jack Henry Clothing Company, docket No. 16476-79.↩
26. Cf. Kaster, "Another View of the Implications of the Supreme Court Decision in Lyon",49 J. Taxation 44 (1978)↩.
27. See Zarrow and Gordon, "Supreme Court's Sale-Leaseback Decision in Lyon Lists Multiple Criteria", 49 J. Taxation 42 (1978), for a discussion of the numerous factors present in Frank Lyon Co. v. United States,435 U.S. 561 (1978). As we said in Hilton v. Commissioner,74 T.C. 305 at 346 n. 19 (1980), the tax aspects of the sale-leaseback transactions, and of Frank Lyon Co. v. United States,supra, have been exhaustively analyzed by the courts and commentators. See also Solomon and Fones, "Sale-Leasebacks and the Shelter Oriented Investor: An Analysis of Frank Lyon Co. and Est. of Franklin",56 Taxes 618 (1978); Kronovet, "Characterization of Real Estate Leases: An Analysis and Proposal", 32 Tax Lawyer 757 (1979); Fuller, "Sales and Leasebacks and the Frank Lyon Case", 48 Geo. Wash. L. Rev. 60 (1979); Note - "Problems of Judicial Interpretation of Real Estate Sale and Leaseback Taxation: Description, Analysis, and Proposed Revision", 33 Tax Lawyer 237 (1979) (includes a chart comparing the facts of Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977), cert. denied 436 U.S. 944 (1978), American Realty Trust v. United States,498 F.2d 1194 (4th Cir. 1974), and Miller v. Commissioner,68 T.C. 767 (1977), with Frank Lyon Co. v. United States,supra); Rosenberg and Weinstein, "Applying the Tax Court's Nontax Benefit Test for Multiparty Sale-Leasebacks", 54 J. Taxation 366 (1981) (authors conclude that in the sale-leaseback context the burdens portion of the "benefits and burdens" test as expressed in Sun Oil Co. v. Commissioner,supra,↩ appears to have been eliminated).
28. From our reading of the record the only relationship between HSM and Field Enterprises at this time was that A. Robert Abboud, officer of the First National Bank of Chicago and later Chairman of the Board of the First National Bank of Chicago, was a member of the Board of Directors of HSM and a member of the Board of Directors of Field Enterprises.↩
29. For simplicity, often we will refer to HSM and its subsidiaries, and subsidiaries of its subsidiaries, collectively as HSM. Technically, HSM has manufacturing subsidiaries, and subsidiaries of subsidiaries, which are quite distinct from its retailing subsidiaries and retailing division. As indicated in our findings of fact, HSM and its manufacturing subsidiaries sell apparel manufactured by them to HSM's retailing subsidiaries and retailing division as well as to independent retailers. As of January 31, 1975, HSM and its retailing subsidiaries owned and operated in excess of 250 stores at which men's and women's apparel was sold.↩
30. Mr. Hehmeyer was executive vice president and general counsel of Field Enterprises from October 1, 1967 until December 31, 1974 and counsel to the law firm of Isham, Lincoln and Beale since January 1, 1975.↩
31. Shortly after its organization, PHS borrowed $5,750,000 from the First National Bank of Chicago. Since $5 million was paid to HSM, PHS had $800,000 remaining in cash as reflected on the balance sheet of January 31, 1975. ↩
32. We note that if Field Enterprises suddenly disavowed any liability with respect to the inventory or promissory note, HSM would possibly have recourse against Field Enterprises under theories of principalagency or misrepresentation but since the parties have not discussed these theories, a discussion at this time would not be proper.↩
33. Indeed, respondent contends that the only risk PHS bore was the remote possibility that if HSM failed, PHS might, along with other creditors, be unable to recover the entire amount still then due.↩
34. See footnote 4, supra.↩
35. Section 1.5 By giving the other party at least 10 days written notice of its election, Buyer or HSM may, at any time between March 18, 1975 and September 14, 1975, require an adjustment to reconcile any difference between: (i) the dollar amount of the Intercompany Inventory on hand (at values used in determining the Purchase Price), as verified by a physical inventory to be taken as of the last day of the settlement period in which such notice is given (the "reconciliation date"), and (ii) the dollar amount shown as Intercompany inventory (at values used in determining the Purchase Price) on the books of Buyer maintained in accordance with this agreement as of such reconciliation date (before taking into account any adjustment resulting from the taking of a physical inventory). For each reconciliation date, the amount determined under (i) is hereinafter called "Sellers' Balance", and the amount determined under (ii) is hereinafter called "Buyer's Balance". If Sellers' Balance is less than Buyer's Balance, HSM shall within 30 days pay to Buyer an amount equal to such difference, and if Sellers' Balance is greater than Buyer's Balance, Seller may prepare a supplemental Exhibit IV, pursuant to Section 1.6, reducing the next payment to Buyer by the amount of such defference.↩
36. The matching of payments is undoubtedly of fundamental concern to respondent. The following chart represents the planned schedule of payments only if an adjustment was not called for by either party: $25,000,000 Promissory Note
Exact Amount Due
Date
PHS to HSM
HSM to PHS
Net to PHS
3-17-75
$6,250,000
$7,571,250
$1,321,250
4-15-75
5,000,000
5,057,000
1,057,000
5-15-75
3,750,000
4,542,750
792,750
6-16-75
2,500,000
3,028,500
528,500
7-15-75
2,500,000
3,028,500
528,500
8-15-75
2,500,000
3,028,500
528,500
9-15-75
2,500,000
3,028,500
528,500
With respect to the payment of purchase price planned to coordinate to payments received from operations, see Frank Lyon Co. v. United States, 435 U.S. 561 (1978), and Commissioner v. Brown,380 U.S. 563↩ (1965).
37. Petitioner contends that even if we find that PHS bore no risk of loss under the Agreement, the transaction would still constitute a sale under the Supreme Court's analysis in Commissioner v. Brown,380 U.S. 563 (1965). See also Citizens National Bank of Waco v. United States,213 Ct. Cl. 236, 551 F.2d 832↩ (Ct. Cl. 1977). We need not comment on this alternative ground since we have found that PHS bore a risk of loss.
38. We note that as of January 31, 1976, sales at retail of the inventory were in the amount of $56,529,380 with inventory with a value of $4,288,366 still unsold to consumers.↩
39. For example, Mr. Meinert testified that his purpose in negotiating the Agreement was that he "* * * wanted to have a sale of all the intercompany inventory held by us, held by a retail subsidiary" and that banks "* * * were not allowed to buy inventory as they could receivables", thus accounting for the selection of PHS as the potential purchaser.↩
40. We note that according to Mr. Hehmeyer this is a customary segregation technique in the retail business.↩
41. According to the Form 10-Q filed with the SEC, HSM operations were not materially affected by a brief strike in June 1974, although it was the first strike by the Amalgamated Clothing Workers Union in 60 years. ↩
42. In a step specifically designed, according to Mr. Meinert, to eliminate short term debt for this period, management induced major fabric suppliers to accept payment in February, 1975, on invoices some of which were due as early as December, 1974. The meticulous care taken by HSM to meet the 45 day objective is revealed by the timing of the check to Burlington Industries dated February 13, 1975, but calculated not to clear, considering George Washington's birthday, before February 18, 1975, the date ending the 45-day period.↩
43. The favorable rulings received by HSM with respect to sales of accounts receivable cannot be used as precedent in determining whether the transaction effectuated under the Agreement constitutes a sale. Sec. 6110(j)(3). They are relevant, however, in determining the intent of Mr. Stewart in drafting the Agreement, and the intent of Mr. Meinert in negotiating the Agreement, to conform with prior sales of accounts receivable.↩
44. The insignificance of the Great Western merchandise is revealed by Mr. Meinert who could not even recall if the Great Western goods were subject to the Agreement and speculated that if they were not part of the Agreement it was probably because they were indeed so insignificant.↩
45. Also see, e.g., Ill. Ann. Stat. ch. 26 § 6-103(1) (Smith-Hurd 1963); Cal. Commercial Code § 6103(1) (West 1964); N.C. Gen. Stat. 25-6-103(1) (Michie 1965); Minn. Stat. Ann.§ 336.6-103(1)↩ (West 1966).
46. In Darby v. Ewing's Home Furnishings,278 F. Supp. 917 (W.D. Okla. 1967), a case relied on by respondent for the proposition that compliance with the Bulk Sales Act is mandatory, the court stated: The 1964 edition of "Forms and Procedures Under the Uniform Commercial Code [sic], by William F. Willier, Professor of Law, Boston College Law School, and Frederick M. Hart, Professor of Law, Boston College Law School, says in Section 61.03 "Even when Article 6 applies, the Code does not make the transfer illegal or automatically void because the parties have failed to act in accord with the provisions of the Article, and, except in those states which have adopted the optional Section 6-106, no personal liability attaches to the transferee for want of compliance. Since the results flowing from noncompliance are limited, and evaluation of the risks involved in not following the required procedure of Article 6 may be worthwhile in those situations where an otherwise profitable transaction would be rendered impractical by the delays and paper work required by Article 6. For example, the necessity of waiting ten days after giving notice of the sale before taking possession might interfere with the transferee's plans for a quick resale. If the transferee has complete confidence in the solvency of the transferor and his willingness to pay creditors, he may be satisfied that compliance is unnecessary. However, this decision should be made cautiously as the mere failure to follow the requirements of Article 6 opens even an honest transfer to attack and may, where Section 6-106 has been enacted, impose personal liability on the transferee." [Italics mine] See also White & Summers, Uniform Commercial Code, Section 19-4, pp. 653-657 (1972).↩
47. We also note that the qualification fees are referred to in another section of this memorandum as an expense of Field Enterprises not accounted for in the documents as drafted at that time. ↩
48. Both respondent and petitioner contend that characterization of the transaction for State law purposes is not controlling for Federal income tax purposes and then, nonetheless, support their respective positions with an analysis under State law.Respondent contends that although Federal income tax is not controlled by the niceties of State law concepts, the transaction does not constitute a sale under principles of Illinois law while petitioner contends that although State law is not determinative for Federal income tax purposes, the transaction was a sale under applicable Illinois law. Since both parties are in agreement that State law is not controlling for Federal income tax purposes, we need not determine whether the transaction constitutes a sale under Illinois law.↩